IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

EDDIE ORTIZ, JR.,

         Petitioner,                No. CIV S-08-2165-JAM-TJB

    vs.

JAMES A. YATES,

         Respondent.           FINDINGS AND RECOMMENDATIONS

_____/

## I.  INTRODUCTION

Petitioner Eddie Ortiz, Jr., is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, it is recommended that the petition be denied.

## II.  PROCEDURAL HISTORY

1.  On June 25, 2004, Petitioner was charged with a single count of attempted murder. Lodged Doc. No. 18, Clerk's Tr. 20.

2.  On May 18, 2005, Petitioner waived his right to a jury trial.  *Id.* at 65.

3.  On May 20, 2005, the bench trial began.  *Id.* at 71.

4.  On August 12, 2005, the trial court found Petitioner guilty of attempted murder as charged.  *Id.* at 134.  The trial court also found Petitioner was armed and used a

1

firearm within the meaning of Section 12022.53(b)-(d) of the California Penal Code. *Id.* at 135; Lodged Doc. No. 20, Rep.'s Tr. 273.

5.  On January 25, 2006, the trial court:  (1) denied Petitioner's motions for a new trial and to substitute counsel; and (2) sentenced Petitioner to an aggregate term of thirty-five years to life, consisting of a midterm of seven years for attempted murder, an enhancement of twenty-five years to life under section 12202.53(d), and three one-year enhancements under section 667.5(b).  Lodged Doc. No. 18, Clerk's Tr. 214-20.

A.  Direct Review

1.  On February 2, 2006, Petitioner filed a direct appeal in the California Court of Appeal, Third Appellate District.  *Id.* at 221.

2.  On May 2, 2007, the Court of Appeal issued a reasoned decision affirming judgment, Lodged Doc. No. 5, at 12, but remanding the case for "further proceedings to determine the truth of the prior prison term allegations and for resentencing on those allegations if they are found to be true."  *Id.* at 11.

3.  Dated May 10, 2007, Petitioner's petition for rehearing was filed in the Court of Appeal.  *See* Lodged Doc. No. 6.

4.  On May 31, 2007, the Court of Appeal issued an order modifying the opinion but denying rehearing.  *See* Lodged Doc. No. 7.

5.  Dated June 21, 2007, Petitioner's petition for review was filed in the California Supreme Court.  *See* Lodged Doc. No. 8.

6.  On August 8, 2007, the California Supreme Court denied Petitioner's petition for review without comment or citation.  *See* Lodged Doc. No. 9.

B.  State Habeas Review

1.  On January 10, 2007, Petitioner filed a habeas petition in the California Court of Appeal, Third Appellate District.  *See* Lodged Doc. No. 10.

2.  On January 18, 2007, the Court of Appeal denied the habeas petition with only a

2

citation to *In re Hillery*, 202 Cal. App. 2d 293, 20 Cal. Rptr. 759 (1962).  *See* Lodged Doc. No. 11.

3.   On May 15, 2007, Petitioner filed a habeas petition in the Butte County Superior Court.  *See* Lodged Doc. No. 12.

4.   On May 22, 2007, the Superior Court denied the habeas petition for three reasons:  (1) undue delay; (2) failure to raise issue on appeal; and (3) issues resolved on appeal cannot be reconsidered on habeas corpus.  *See* Lodged Doc. No. 13.

5.   On July 9, 2007, Petitioner filed a habeas petition in the California Court of Appeal, Third Appellate District.  *See* Lodged Doc. No. 14.

6.   On August 16, 2007, the Court of Appeal denied the habeas petition without comment or citation.  *See* Lodged Doc. No. 15.

7.   On September 10, 2007, Petitioner filed a habeas petition in the California Supreme Court.  *See* Lodged Doc. No. 16.

8.   On April 9, 2008, the California Supreme Court denied the habeas petition without comment or citation.  *In re Ortiz*, No. S156195, 2008 Cal. LEXIS 3973, at *1 (Cal. Apr. 9, 2008).

C.   Federal Habeas Review

1.   On September 3, 2008, Petitioner filed the instant federal habeas petition.

2.   On November 6, 2008, Respondent filed an answer to the petition.

3.   On March 5, 2009, Petitioner filed a traverse.

### III.  FACTUAL BACKGROUND[1]

On New Year's Eve 2003, [Petitioner] partied at the trailer home

---

[1] These facts are from the California Court of Appeal's opinion issued on May 2, 2007. *See* Lodged Doc. No. 5, at 2-3.  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Moses v. Payne,* 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir. 2004).

of his girlfriend, Roxanne Peralta.  When Sean DeMel arrived around 9:00 p.m. and walked into the trailer, he and [Petitioner] exchanged a few words.  Peralta sensed there was tension between DeMel and [Petitioner], who walked outside onto the porch and down the stairs.  DeMel followed [Petitioner], and Peralta followed DeMel.  As [Petitioner] reached the bottom of the stairs, he turned around, removed a .22-caliber semiautomatic gun from a holster, pointed it at DeMel, who was standing on the porch near the top of the stairs.  DeMel told [Petitioner] to "[p]ut away the gun," and they stared at each other for a couple of minutes before [Petitioner] shot DeMel in the chest.  Peralta was about three feet from DeMel and about four feet from [Petitioner] when DeMel was shot.  After [Petitioner] shot DeMel, he walked to a friend's car and drove away.

DeMel testified that he had seen [Petitioner] once before the night of the shooting and that nothing "unfriendly" had occurred.  DeMel denied saying anything to [Petitioner] when DeMel entered the trailer.  He explained that later, while [Petitioner] was on the porch and DeMel was inside the trailer, DeMel asked [Petitioner] "what was up," and [Petitioner] told DeMel to "get off [him]," i.e., "[l]eave him alone."  DeMel then joined [Petitioner] on the porch and introduced himself.  [Petitioner] told DeMel his name, held up a handgun, and again told DeMel to "[g]et off [him]."  [Petitioner] then shot DeMel in the chest from a distance of about 20 feet.[2]

Although the gunshot was painful, DeMel did not fall down.  A friend took DeMel to Feather River Hospital, where he was flown by helicopter to Enloe Hospital.  The bullet left two puncture wounds and a bullet fragment "just beneath the skin surface by about 1 cm."  DeMel was kept in the hospital overnight for observation.

## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

---

[2] DeMel told medical personnel that he had been shot from a distance of less than 15 feet.

U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999).  Under

AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.

Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

In applying AEDPA's standards, the federal court must "identify the state court decision

that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

Where more than one state court has adjudicated Petitioner's claims, a federal habeas court

analyzes the last reasoned decision.  *Id.* (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)

("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

orders upholding that judgment or rejecting the same claim rest upon the same ground.")).  A

federal habeas court looks through ambiguous or unexplained state court decisions to the last

reasoned decision to determine whether that decision was contrary to, or an unreasonable

application of, clearly established federal law.  *Bailey v. Rae,* 339 F.3d 1107, 1112-13 (9th Cir.

2003).  "The question under AEDPA is not whether a federal court believes the state court's

determination was incorrect but whether that determination was unreasonable--a substantially

higher threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at

410).  When no state court reached the merits of a claim, the federal court must review that claim

de novo.  *See Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005) (applying de novo standard

of review to claim in habeas petition that was not adjudicated on merits by state court), *cert.

denied*, 547 U.S. 1128 (2006); *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (same); *Pirtle

v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) ("[W]hen it is clear that a state court has not

reached the merits of a properly raised issue, we must review it de novo.").

## V.  CLAIMS FOR REVIEW

The petition for writ of habeas corpus sets forth five grounds for relief:

1.  Petitioner's right to "discharge . . . retained counsel" and to obtain his "counsel of choice" was denied.  Pet'r's Pet. 10, ECF No. 1.

2.  Petitioner's trial counsel was ineffective because "trial counsel failed to subpoena alibi witness, investigate, defend against evidence, challenge I.D. issue, subpoena Lt. Phil Serna on his report of planted evidence, [which] fell below the standard . . . of . . . *Strickland v. Washington*, 466 U.S. 688 (1984) . . . ."  Pet'r's Pet. 2

3.  Petitioner was "actually innocent," and he had "newly discovered evidence."  *Id.*

4.  Petitioner's trial counsel rendered ineffective assistance in advising Petitioner to waive his right to a jury trial and proceed by bench trial instead.  *Id.* at 11.

5.  "The evidence of G.B.I. [great bodily injury] was insufficient and the evidence of attempted murder was insufficient."  *Id.* at 27.

Some of Petitioner's five grounds for relief overlap.  To the extent possible, the grounds resolved by binding authority are grouped together.  Some grounds are referenced more than once as they refer to separate issues.  The remaining grounds are reviewed in seriatim.  Petitioner's grounds are addressed as follows:

1.  Ground One:  Right to Counsel of Choice

2.  Ground One:  Conflict With Counsel

3.  Grounds Two, Four, and Five:  Ineffective Assistance of Counsel

4.  Ground Three:  Actual Innocence

5.  Ground Five:  Insufficient Evidence

For the following reasons, Petitioner's grounds do not entitle him to habeas relief.

A.  Ground One:  Right to Counsel of Choice

In ground one, Petitioner argues "the trial court wrongfully denied Petitioner [the right] to

6

1    discharge retained counsel," Eric Ortner, violating Petitioner's "right to counsel of choice."  *Id.* at

2    13.  Petitioner alleges he "was forced to continue against his will for 5 months with an attorney

3    he no longer trusted," from "June 17, 2005 of requested discharge to November 15, 2005."  *Id.*

4    (citations omitted).  Petitioner asserts "there's no record of" his motions for a new trial and to

5    substitute counsel.  *Id.* at 14.

6              1.  State Court Decision

7              Here, on January 10, 2007, Petitioner first raised his right to choice of counsel claim in

8    his habeas petition filed in the California Court of Appeal.  *See* Lodged Doc. No. 10, at 1

9    ("Argument") ("The failure to allow Petitioner to discharge retained counsel[] violated . . . . the .

10   . . Sixth and Fourteenth [Amendments].").  On January 18, 2007, the Court of Appeal denied the

11   habeas petition on procedural grounds, with only a citation to *In re Hillery*, 202 Cal. App. 2d

12   293, 20 Cal. Rptr. 759 (1962).  *See* Lodged Doc. No. 11.  In *In re Hillery*, the Court of Appeal

13   held that "[t]here is no question but that this court has jurisdiction to issue the writ of habeas

14   corpus.  But this court has discretion to refuse to issue the writ as an exercise of original

15   jurisdiction on the ground that application has not been made therefor in a lower court in the first

16   instance."  202 Cal. App. 2d at 294, 20 Cal. Rptr. at 760.

17            On May 15, 2007, Petitioner raised this claim in his habeas petition filed in the Superior

18   Court.  *See* Lodged Doc. No. 12, at 1 ("Ground One") ("Petitioner was not allowed to discharged

19   retained counsel, in violation of Petitioner's rights under the 6th Amendment . . . .").  On May

20   22, 2007, the Superior Court issued an "Order Denying Petition or Transferring Petition," which

21   was a checklist of reasons for denying habeas relief.  *See* Lodged Doc. No. 13.  The Superior

22   Court marked three procedural grounds justifying denial:  (1) undue delay; (2) failure to raise

23   issue on appeal; and (3) issues resolved on appeal cannot be reconsidered on habeas corpus.  *Id.*

24            Subsequently, Petitioner raised this claim in his habeas petitions filed in the Court of

25   Appeal and California Supreme Court.  *See* Lodged Doc. Nos. 14 and 16, at 3.  Both the Court of

26   Appeal and California Supreme Court issued decisions without comment or citation.  *See* Lodged

7

1    Doc. No. 15; *In re Ortiz*, 2008 Cal. LEXIS 3973, at *1.

2          "[T]he California Constitution provides that each of the three levels of state courts --

3    Superior Courts, Courts of Appeal, and the Supreme Court -- has 'original jurisdiction in habeas

4    corpus proceedings.'" *Gaston v. Palmer*, 387 F.3d 1004, 1010 (9th Cir. 2004) (quoting Cal.

5    Const. art. VI, § 10), *amended for other reasons by* 447 F.3d 1165 (9th Cir. 2006).  A California

6    prisoner may file an original habeas petition in each of the three courts, and each court may

7    exercise its original jurisdiction.  *See, e.g.*, *In re Clark*, 5 Cal. 4th 750, 760-62, 21 Cal. Rptr. 2d

8    509, 855 P.2d 729 (1993) (noting petitioner's first habeas application was filed in California

9    Supreme Court).  When the state's higher courts issue postcard denials, i.e., decisions without

10   comment or citation, the Ninth Circuit construes those denials as decisions on the merits.

11   *Gaston*, 387 F.3d at 1013 (citing *Hunter v. Aispuro*, 982 F.2d 344, 348 (9th Cir. 1992)); *see In re*

12   *Clark*, 5 Cal. 4th at 769 n.9, 21 Cal. Rptr. 2d 509, 855 P.2d 729 (noting "summary denial" of

13   state habeas petition "does not mean that the court has not considered the merits of the claims").

14         "State procedural bars . . . may expire because of later actions by state courts.  If the last

15   state court to be presented with a particular federal claim reaches the merits, it removes any bar

16   to federal-court review that might otherwise have been available."  *Ylst*, 501 U.S. at 801.

17   "[W]hen no reasoned state court decision denying a habeas petition exists, the federal court

18   should perform an independent review of the record to ascertain whether the state court decision

19   was objectively unreasonable."  *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per

20   curiam).

21         Here, the Court of Appeal and California Supreme Court summarily denied this claim on

22   the merits when they denied Petitioner's habeas petition without comment or citation.[3]  *Hunter*,

23   982 F.2d at 348.  These decisions removed the procedural bars applied by the Superior Court.

24   *Ylst*, 501 U.S. at 801.  Since no state court issued a reasoned opinion explaining its denial of this

25   ───────────────────

26         [3] Respondent asserts that "the state courts denied this claim solely on procedural grounds
     . . . ."  Resp't's Answer 10, ECF No. 13.  *But see supra* Part V.A.1.

                                                    8

claim on the merits, "an independent review of the record" will be conducted to determine

whether the California Supreme Court's decision denying this claim was contrary to, or involved

an unreasonable application of, clearly established federal law. *Pham*, 400 F.3d at 742.

2.  Analysis of Right to Counsel of Choice Claim

Petitioner fails to demonstrate a deprivation of his right to choice of counsel.  The Sixth

Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to

have the Assistance of Counsel for his defence."  "[A]n element of this right is the right of a

defendant who does not require appointed counsel to choose who will represent him." *United

States v. Gonzalez-Lopez,* 548 U.S. 140, 144 (2006); *Wheat v. United States*, 486 U.S. 153, 159,

(1988).

A defendant's right to counsel of his choice, however, is not absolute.  "[W]hile the right

to select and be represented by one's preferred attorney is comprehended by the Sixth

Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each

criminal defendant rather than to ensure that a defendant will inexorably be represented by the

lawyer whom he prefers." *Wheat*, 486 U.S. at 159.  The Sixth Amendment right to choose one's

own counsel is circumscribed in several important respects. *Id.* (giving as examples that

defendant may not choose lawyer whom he cannot afford, who declines to represent him, who

has conflict, or who is not member of bar).  The right to select counsel of one's choice is "the

right to a particular lawyer regardless of comparative effectiveness," and deprivation of the right

is complete when the defendant is "erroneously prevented from being represented by the lawyer

he wants." *Gonzales-Lopez*, 548 U.S. at 148.

Here, until the trial court allowed substitution on November 15, 2005, the record shows

there was no other lawyer Petitioner wished to retain.  On May 27, 2004, Petitioner "retain[ed]

Eric R. Ortner to act as [his] attorney in the matter of:  <u>People v. Eddie Ortiz</u>, Butte County

Superior Court Case No[].:  CM020732."  Lodged Doc. No. 10, Ex. A, at 1.  The bench trial

began almost a year later, on May 20, 2005, and the record reveals Petitioner did not express

1    dissatisfaction with Ortner until almost a month after that, on June 17, 2005, after presentation of

2    evidence but before closing arguments.  Lodged Doc. No. 20, Rep.'s Tr. 237.  Petitioner also

3    admits he did not "inform[] the court of the discharge of retained counsel" until June 17, 2005.

4    *See* Pet'r's Pet. 13.  Specifically:

5        1.  On June 17, 2005, Petitioner attempted to address the trial court.  Lodged Doc. No.

6             20, Rep.'s Tr. 237.  The trial court suggested, "Why don't you run it by your attorney

7             first because you never know if it will help or hurt you."  *Id.*  Petitioner responded,

8             "There's nothing to be said.  I'm dismissing him as my counsel today."  *Id.*  The trial

9             court then held the following:

10                   THE COURT:  Hold on.  I'm going to deny your request at this
                     time.  To the extent you wish to follow up on that given the fact
11                   that we've already had the trial in this matter -- we're just pending
                     ruling, then I will -- if you want to put something in writing --
12                   perhaps that's what has been sent to me -- I don't know.[4]  But if,
                     after conferring with Mr. Ortner, you wish to pursue the matter,
13                   we'll do so at an appropriate time but now is not that time.

14                   [PETITIONER]:  I do have something in writing, your Honor.  I

15   ───────────────────────

16        [4] The trial court was referring to two letters Petitioner sent on June 6, 2005, and June 14,
     2005.  Lodged Doc. No. 20, Rep.'s Tr. 235.  At the June 17, 2005 hearing, the State expressed
17   concern about the trial court reading the letters because it would appear "questionable in that the
     Court is hearing the trial."  *Id.*  The trial court responded, "I think on that, Mr. Ortner, the best
18   thing would be for you to review those.  And based on your review, . . . if you still think it's
     appropriate I review them, then, obviously, the [State is] entitled to them as well.  If, after your
19   review, you don't think it's a good idea for your client that I review the contents, I will keep it
     sealed and I will not review the letter.  Does this sound appropriate?"  *Id.*  Ortner agreed.  *Id.*
20   The record does not reflect what was in those letters, and does not specifically refer to the letters
     again.

21        On August 12, 2005, however, the trial court did state generally, "To let counsel know, I
     know one of the issues was whether the Court should even read the materials that were filed by
22   [Petitioner] and to let counsel know, I will try to be up front, I have read those materials.  It's my
     belief that [the State] is right, should [Petitioner] not testify . . . I don't think it would be
23   appropriate to consider that in terms of the actual fact finding that I will need to do."  *Id.* at 245.
     Thus, "in terms of any written communications from [Petitioner]," the trial court was "inclined
24   not to consider that in terms of [its] decision as to whether or not he should be found guilty of
     any offense."  *Id.*  The trial court emphasized, "I have read everything that's been presented and
25   in the interest of saving time, trying to be efficient, that I want the record to reflect that I think I
     know my duties and obligations and certainly can separate out what I think is appropriate versus
26   what's not at this time . . . ."  *Id.* at 263.

1       have a motion for a new trial under Penal Code 1181 and 82 before
    judgment and --

2

3       THE COURT:  Okay.  Well, we haven't even had a ruling yet, so I
    believe that's premature.  So what I would suggest sir, is that you
    keep those documents --

4

5       [PETITIONER]:  Right.

6       THE COURT:  -- and if appropriate they certainly will be filed at
    the appropriate time, and I will certainly consider them.  But for
    the time being since I haven't even ruled -- I might find you not

7       guilty and then there would be no need for a motion for new trial.
    So wait until we see what happens there.

8

9   *Id.* at 237-38.  The June 17, 2005 hearing was adjourned to July 15, 2005.  Lodged

10  Doc. No. 18, Clerk's Tr. 77.  At the time, the record does not reflect Petitioner had

11  another attorney he wished to retain.

12  2.  In a letter dated June 23, 2005, attached as Exhibit J to the instant petition, Petitioner

13      informed the trial court that he was "very upset" on June 17, 2005, because Ortner

14      was not "showing effort or applying himself to [his] case."  Pet'r's Pet. Ex. J, at 47.

15      Nothing in the letter shows Petitioner had another attorney he wished to retain.

16  3.  On July 15, 2005, the trial court asked whether the State wanted to respond to

17      Petitioner's two filed documents:  (1) a "verdict document," Lodged Doc. No. 20,

18      Rep.'s Tr. 240; *see* Lodged Doc. No. 18, Clerk's Tr. 119-22; and (2) an "argument

19      and case authority from [Petitioner] for acquittal."  Lodged Doc. No. 20, Rep.'s Tr.

20      240; *see* Lodged Doc. No. 18, Clerk's Tr. 78-122.  The State asked the trial court not

21      to read the second document because it included:  (1) "an argument by [Petitioner]

22      submitted by his attorney;" (2) "photographs;" and (3) "police report pages."  Lodged

23      Doc. No. 20, Rep.'s Tr. 240.  According to the State, "none of [these] [we]re

24      introduced in evidence at trial," so "it's an improper argument and it is improper

25      testimony from [Petitioner].  Additionally, the evidence portion was closed."  *Id.*  The

26      trial court stated the parties should "file everything you want to file as quickly as

possible and hopefully we'll be in a position to go forward and actually resolve this matter on [August] 12th." *Id.* at 241.  The record does not show that Petitioner tried to discharge Ortner at this time, or that Petitioner had another attorney he wished to retain.

4.   On August 12, 2005, after Petitioner was found guilty of attempted murder and being armed and using a firearm, Petitioner tried to submit his motion for a new trial again. *Id.* at 277; *see* Lodged Doc. No. 18, Clerk's Tr. 135.  In this motion, attached as exhibit K to the instant petition, Petitioner contends trial counsel was ineffective. Pet'r's Pet. Ex. K, at 51-52.  The trial court stated:

> [The motion] can't be filed at this time because for the time being Mr. Ortner is still your attorney and I believe we only allow attorneys to file documents as opposed to their client[s] but I will certainly allow to you present it to the Court and I will consider it but it will not be filed.

Lodged Doc. No. 20, Rep.'s Tr. 277.  The case was adjourned to September 13, 2005 for probation/sentencing.  Lodged Doc. No. 18, Clerk's Tr. 133.  At this time, the record does not reveal Petitioner had another attorney he wished to retain.

5.   Dated August 22, 2005, Petitioner's probation statement likewise contends his trial counsel was ineffective.  Pet'r's Pet. Ex. L, at 56-59.  Nothing in Petitioner's probation statement reflects Petitioner had another attorney he wished to retain.

6.   At the September 13, 2005 hearing, Petitioner's appearance was waived, and the case was adjourned to October 12, 2005 for probation/sentencing.  Lodged Doc. No. 18, Clerk's Tr. 143.  The record does not reflect that Petitioner tried to discharge Ortner at this time, or that he had another attorney he wished to retain.

7.   At the October 12, 2005 hearing, Petitioner's appearance was waived, and the case was adjourned to November 8, 2005 for probation/sentencing and Petitioner's motion for a new trial.  *Id.* at 154.  The record does not reveal that Petitioner tried to discharge Ortner at this time, or that he had another attorney he wished to retain.

12

8. At the November 8, 2005 appearance, the case was continued to November 15, 2005 for probation/sentencing and for Petitioner's motion for a new trial. *Id.* at 157.

9. On November 15, 2005, the trial court granted permission for Russell W. Miller, Jr.,[5] to substitute as defense counsel. *Id.* at 158. The case was adjourned to December 6, 2005, for probation/sentencing and Petitioner's motion for a new trial.[6] *Id.*

Since Petitioner was not "erroneously prevented from being represented by the lawyer he wants," as Petitioner had no other attorney he sought to hire, Petitioner was not deprived of a "right to a particular lawyer" of his choice. *Gonzales-Lopez*, 548 U.S. at 148.

To the extent Petitioner argues the trial court violated his constitutional rights by denying him a continuance to obtain new counsel, this claim also fails. The United States Supreme Court reiterated that a trial court retains "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *Id.* at 152; *see also Miller v. Blackletter*, 525 F.3d 890, 895 (9th Cir. 2008). "As such, trial courts retain the discretion to 'make scheduling and other decisions that effectively exclude a defendant's first choice of counsel.'" *Miller*, 525 F.3d at 895 (quoting *Gonzalez-Lopez*, 548 U.S. at 152).

In evaluating a similar habeas claim, the Ninth Circuit considered three factors: (1) whether the defendant had retained new counsel; (2) whether current counsel was prepared and competent to proceed forward; and (3) the timing of defendant's request to continue. *Id.* at 896-98. In *Miller*, the court denied a habeas petition alleging a violation of the right to counsel where: (1) the petitioner requested the continuance the morning that trial was scheduled to begin; (2) the petitioner had not yet retained a lawyer; and (3) his appointed lawyer was prepared

---

[5] On January 25, 2006, Petitioner tried to substitute M. Rooney as counsel in place of Miller, which the trial court denied. *See* Lodged Doc. No. 18, Clerk's Tr. 217.

[6] Respondent contends, after June 17, 2005, "[t]he record contains no further request by Petitioner to dismiss Ortner, *or any other expression of dissatisfaction with him*[,] until November 15, 2005 . . . ." Resp't's Answer 11 (emphasis added). *But see supra* pp. 10-13, ¶¶ 1-9.

1    to represent him.  *Id.*  The same analysis dictates the same result here.

2          First, in the instant case, as in *Miller*, the record does not show Petitioner had retained

3    new counsel when he sought to "dismiss[]" Ortner.  Lodged Doc. No. 20, Rep.'s Tr. 237.  There

4    is no evidence that Petitioner had hired a new attorney who was willing and able to proceed with

5    the trial.  The first factor does not support Petitioner's claim.  *Id.*

6          Second, in both the instant case and *Miller*, the existing lawyer was ready and able to

7    represent Petitioner.  On June 2, 2005, "the evidence part of the trial" was concluded, and

8    because the case involved a bench trial and "not . . . a jury," the trial court had "the luxury of

9    time" and allowed briefing on several issues.  *Id.* at 226.  At the following appearance, on June

10   17, 2005, although counsel were "unable to get their briefs in," *id.* at 233, Ortner explained

11   Petitioner "believe[d] that there's evidence that has been overlooked . . . [and] needs to be

12   brought to the Court's attention."  *Id.*  Ortner stated:

13                 I would ask that this matter be set on July 15th, and I would ask
                   that sufficient time be set aside on July 15th to deal with any
14                 eventuality that may arise in [Petitioner]'s case between now and
                   then.  And I will address those concerns with him and, as
15                 appropriate, bring that to the attention of [the State] and will
                   address all of those matters on July 15th."

16

17   *Id.* at 234.  The trial court granted this request.[7]  *Id.* at 238.  The second factor also does not

18   support Petitioner's claim.

19   ───────────────────

20        [7] Specifically, the trial court ordered Ortner to file "anything you're going to file in
     writing by . . . Friday, July 1st."  Lodged Doc. No. 20, Rep.'s Tr. 236.  The record shows Ortner
21   did not file any documents until July 14, 2005, when Ortner filed two documents.  One document
     was called "Argument and Case Authority from [Petitioner] for Acquittal," which included:  (1) a
22   letter from Petitioner dated May 20, 2005; (2) a written argument from Petitioner dated May 20,
     2005, incorporating police reports; (3) a news article dated May 29, 2004; and (4) a copy of *Kyles
     v. Whitley*, 514 U.S. 419 (1995).  Lodged Doc. No. 18, Clerk's Tr. 78-118.  The other document
23   was titled "Memorandum of Points and Authorities re Verdict."  *Id.* at 119-22.  Although the
     briefs were filed about two weeks late, this was not prejudicial.  The case was further adjourned
24   to August 12, 2005, to allow the State to respond, effectually allowing Petitioner more time to
     retain new counsel.  Lodged Doc. No. 20, Rep.'s Tr. 264.  Additionally, the trial court indicated
25   it "read everything that's been presented," including the late filed documents.  *Id.* at 263.  The
     record reflects Ortner listened to Petitioner and brought the allegedly overlooked evidence to the
26   trial court's attention.

1    Third, Petitioner's request is untimely.  On June 17, 2005, Petitioner first sought to

2 "dismiss[]" Ortner in court, almost a month after the bench trial began, after presentation of

3 evidence, but before closing arguments.  *Id.* at 237.  After the trial court denied Petitioner's

4 dismissal "at this time," the trial court mentioned Petitioner may "put something in writing."  *Id.*

5 In a letter dated June 23, 2005, Petitioner followed up with a letter to the trial court alleging

6 Ortner "has failed by ineffective assistance of counsel."  Pet'r's Pet. Ex. J, at 79.  Petitioner did

7 not express dissatisfaction again until August 12, 2005, after he was found guilty of attempted

8 murder and being armed and using a firearm, Lodged Doc. No. 20, Rep.'s Tr. 277, and once

9 more, in his probation statement dated August 22, 2005.  Pet'r's Pet. Ex. L, at 56-59.

10    "[U]nder the law of th[e] [Ninth] [C]ircuit, there is no automatic right to a substitution of

11 counsel simply because the defendant informs the trial court that he is dissatisfied with appointed

12 counsel's performance."  *Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir. 1990); *Hudson v. Rushen*,

13 686 F.2d 826, 832 (9th Cir. 1982), *cert. denied*, 461 U.S. 916 (1983).  In between Petitioner's

14 expressions of dissatisfaction, nothing in the record indicates Petitioner tried to retain new

15 counsel, and Petitioner does not justify the timing of his requests.  The third factor weighs

16 against Petitioner's claim.

17    In sum, "only [a trial court's] unreasonable and arbitrary 'insistence upon expeditiousness

18 in the face of a justifiable request for delay violates the Sixth Amendment."  *Miller*, 525 F.3d at

19 897 (quoting *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)).  Given all of the facts of this case, the

20 trial court's decision to deny Petitioner's request to "dismiss[]" Ortner, or what may be

21 interpreted as Petitioner's requests for continuances to obtain new counsel, was neither arbitrary

22 nor unreasonable.  *Morris*, 461 U.S. at 12-14 (holding defendant's Sixth Amendment rights were

23 not violated where trial court refused to continue trial to permit defendant's preferred public

24 defender to represent him); *Miller*, 525 F.3d at 895-98 (finding no violation of right to counsel

25 where trial court denied continuance requested morning of trial and new counsel had not yet been

26 retained); *Bradley v. Henry*, 510 F.3d 1093, 1100 (9th Cir. 2007) (determining trial court "may

15

1    deny motion to substitute retained counsel if there is a substantial risk that the delay will result in

2    an undue delay of the proceedings").  Petitioner is not entitled to habeas relief on his right to

3    choice of counsel claim.

4            B.  Ground One:  Conflict With Counsel

5            In ground one, Petitioner argues that the trial court violated his constitutional rights by

6    not permitting Petitioner to discharge his counsel until November 15, 2005, where there was an

7    "irreconcilable conflict" and a "strained communication breakdown."  Pet'r's Pet. 13.

8            1.  State Court Decision

9            Petitioner's conflict with counsel claim follows the same procedural history as

10   Petitioner's right to choice of counsel claim.  *See supra* Part V.A.1; *see also* Lodged Doc. No.

11   10, at 2 ("Statement of Facts") (showing in Court of Appeal habeas petition, "Petitioner did

12   inform the court on said date of his desire to dismiss retained counsel (Eric R. Ortner) . . . due to

13   irreconciliable [sic] conflict"); Lodged Doc. No. 11 (Court of Appeal decision); Lodged. Doc.

14   No. 12, at 1 ("Ground One") (Superior Court habeas petition); Lodged Doc. No. 13 (Superior

15   Court decision); Lodged Doc. No. 14, at 3 (Court of Appeal habeas petition); Lodged Doc. No.

16   15 (Court of Appeal decision); Lodged Doc. No. 16, at 3 (California Supreme Court habeas

17   petition); *In re Ortiz*, 2008 Cal. LEXIS 3973, at *1 (California Supreme Court decision).  Since

18   Petitioner's conflict with counsel claim was never discussed in a reasoned state court opinion,

19   "an independent review of the record" will be conducted to determine whether the California

20   Supreme Court's denial of this claim was contrary to, or involved an unreasonable application of,

21   clearly established federal law.  *Pham*, 400 F.3d at 742.

22           2.  Analysis of Conflict with Counsel Claim

23           Here, Petitioner does not establish that his lawyer had an actual conflict of interest.  The

24   Sixth Amendment provides a defendant with the right to be represented by an attorney who does

25   not have an actual conflict of interest.  *See Holloway v. Arkansas*, 435 U.S. 475, 483-84 (1978)

26   (finding representation by one attorney of several codefendants violates Sixth Amendment if it

16

1   presents actual conflict of interest).  Petitioner had no codefendants, and there is no evidence that

2   counsel previously represented another client whose representation conflicted with his

3   representation of Petitioner.  Similarly, there is no evidence that any aspect of the individual

4   lawyer created an actual conflict.  *Plumlee v. Masto*, 512 F.3d 1204, 121 (9th Cir. 2008) (noting

5   issue is whether there is actual, legal conflict).

6          Additionally, Petitioner never raised an actual conflict issue during the proceedings, nor

7   would the judge know or reasonably know of any actual, legal conflict.  *See Lockhart v. Terhune*,

8   250 F.3d 1223, 1229-30 (9th Cir. 2001) (summarizing Supreme Court decisions holding, *inter*

9   *alia*, that if "the court knows or reasonably should know that a particular conflict exists[,] it must

10  initiate an inquiry about that conflict" (citation and internal quotation marks omitted)).  When

11  Petitioner expressed dissatisfaction with his attorney, he alleged counsel rendered ineffective

12  assistance, not that counsel had an actual, legal conflict.  *See, e.g.*, Pet'r's Pet. Ex. J, at 47.

13         To the extent Petitioner argues his distrust of his attorney created a conflict requiring new

14  counsel, the law does not support his argument.  In *Morris*, the Supreme Court held that the Sixth

15  Amendment did not guarantee "a meaningful relationship between an accused and his counsel."

16  461 U.S. at 13-14.  In interpreting this holding, the Ninth Circuit recently rejected a similar

17  habeas petitioner's argument, finding no constitutional violation where the petitioner was

18  "represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses

19  to cooperate because of dislike or distrust."  *Plumlee*, 512 F.3d at 1211.  Petitioner's conflict of

20  counsel claim fails.

21         C.  Grounds Two, Four, and Five:  Ineffective Assistance of Counsel

22         In grounds two, four, and five, Petitioner asserts his trial attorney rendered ineffective

23  assistance based on a number of prejudicial errors.  After exhaustion is addressed and the legal

24  standard is set forth, the alleged prejudicial errors resolved by binding authority are grouped

25  together and are reviewed as follows:  (1) failure to subpoena Lieutenant Phil Serna; (2) failure to

26  subpoena and investigate Deborah Farris; (3) failure to subpoena or investigate Don Ryan; (4)

17

failure to call Eric Vierra as a witness; (5) failure to subpoena and investigate medical personnel;

(6) failure to investigate "Tyson;" (7) failure to challenge Officer Paul Hegenbart's testimony; (8)

counsel's contradiction during trial; (9) failure to challenge Roxanne Peralta's testimony; (10)

failure to challenge Detective Jason Imboden's testimony; (11) failure to challenge Bill Dunn's

testimony; (12) advising Petitioner to waive his right to a jury trial; and (13) failure to object to

"the judge and deputy dist. attorney[']s self medical analysis of what [great bodily injury] is."

Pet'r's Pet. 15-21, 28.

       1. Exhaustion

    Here, Petitioner raised the first,[8] second,[9] third,[10] fourth,[11] fifth,[12] and twelfth[13] alleged

prejudicial errors, as numbered above, in all of his state habeas petitions.  Petitioner failed to

---

    [8] *See* Lodged Doc. No. 10, at 4 ("Argument") (Court of Appeal); Lodged Doc No. 12, at 4 ("Ground Four") (Superior Court); (3) Lodged Doc. No. 14, at 4 (Court of Appeal); Lodged Doc. No. 16, at 4 (California Supreme Court).

    [9] *See* Lodged Doc. No. 10, at 4 ("Argument"), 8 ("Statement of Facts") (referring to Deborah Farris as "alibi witness" in Court of Appeal habeas petition, and alleging trial counsel failed to subpoena "alibi witnesses" (internal quotation marks omitted)); Lodged Doc No. 12, at 4 ("Ground Four") (Superior Court); (3) Lodged Doc. No. 14, at 4 (Court of Appeal); Lodged Doc. No. 16, at 4 (California Supreme Court).

    [10] *See* Lodged Doc. No. 10, at 3 ("Argument"), 9 ("Statement of Facts") (referring to Ryan's statements to police in Court of Appeal habeas petition, and alleging trial counsel failed to subpoena "potential witnesses"); Lodged Doc No. 12, at 4 ("Ground Four") (Superior Court); (3) Lodged Doc. No. 14, at 4 (Court of Appeal); Lodged Doc. No. 16, at 4 (California Supreme Court).

    [11] *See* Lodged Doc. No. 10, at 3 ("Argument") (Court of Appeal); Lodged Doc No. 12, at 1 ("Ground Four") (Superior Court); (3) Lodged Doc. No. 14, at 4 (Court of Appeal); Lodged Doc. No. 16, at 4 (California Supreme Court).

    [12] *See* Lodged Doc. No. 10, at 4 ("Argument") (Court of Appeal); Lodged Doc No. 12, at 1 ("Ground Four") (Superior Court); (3) Lodged Doc. No. 14, at 4 (Court of Appeal); Lodged Doc. No. 16, at 4 (California Supreme Court).

    [13] *See* Lodged Doc. No. 10, at 5 ("Argument") (Court of Appeal); Lodged Doc No. 12, at 1 ("Ground Two") (Superior Court); (3) Lodged Doc. No. 14, at 4 (Court of Appeal); Lodged Doc. No. 16, at 4 (California Supreme Court).

1    raise the remaining alleged errors in direct review or in any of his state habeas petitions.[14]

2    *Compare* Pet'r's Pet. 13, 15-21, 24, 28, *with* Lodged Doc No. 10, at 1 ("Argument")-5

3    ("Argument") (January 10, 2007 Court of Appeal habeas petition), Lodged Doc. No. 12, at 1

4    ("Ground One"), 1 ("Ground Two")-2 ("Ground Two"), 1 ("Ground Three")-2 ("Ground

5    Three"), 1 ("Ground Four")-4 ("Ground Four") (May 15, 2007 Superior Court habeas petition),

6    Lodged Doc. No. 14, at 3-5 (July 9, 2007 Court of Appeal habeas petition), *and* Lodged Doc.

7    16, at 3-5 (September 10, 2007 California Supreme Court habeas petition).  Because exhaustion

8    is a procedural defect that could prevent consideration of any of the claims in the current petition,

9    *Rose v. Lundy*, 455 U.S. 509, 522 (1982) ("[W]e hold that a district court must dismiss habeas

10   petitions containing both unexhausted and exhausted claims."), the exhaustion issue is addressed

11   prior to addressing any claim of prejudicial error.

12                               a.  Legal Standard for Exhaustion

13           "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available

14   state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon

15   and correct' alleged violations of prisoners' federal rights."  *Baldwin v. Reese*, 541 U.S. 27, 29

16   (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam)).  "The state courts

17   have been given a sufficient opportunity to hear an issue when the petitioner has presented the

18   state court with the issue's factual and legal basis."  *Weaver v. Thompson*, 197 F.3d 359, 364 (9th

19   Cir. 1999) (citing *Duncan*, 513 U.S. at 365 (legal basis); *Correll v. Stewart*, 137 F.3d 1404,

20   1411-12 (9th Cir. 1998) (factual basis)).  "A petitioner has satisfied the exhaustion requirement

21   if:  (1) he has 'fairly presented' his federal claim to the highest state court with jurisdiction to

22

23           [14] Respondent asserts that Petitioner's ineffective assistance of counsel claim, in general,
24   was "first raised in a state habeas petition filed in Butte County Superior Court" filed on May 15,
     2007.  Resp't's Answer 14.  *But see* Lodged Doc No. 10, at 3 ("Argument")-5 ("Argument")
25   (showing Petitioner alleged, in January 10, 2007 Court of Appeal habeas petition, that "trial
     attorney['s] failure to subpoena and interview potential witnesses, medical physician, adverse
26   and alibi witnesses violated Petitioner['s] due process rights under the U.S. Const. Amend. Sixth
     and Fourteenth . . .").

1  consider it, . . . or (2) he demonstrates that no state remedy remains available." *Johnson v.*

2  *Zenon*, 88 F.3d 828, 829 (9th Cir. 1996) (citations omitted).

3  To have exhausted via the first avenue, a petitioner must have presented each federal

4  claim as a federal claim to the California Supreme Court on (1) direct review (e.g., in a petition

5  for review); or (2) collateral review (e.g., in a petition for a writ of habeas corpus). *See Reiger v.*

6  *Christensen*, 789 F.2d 1425, 1427 (9th Cir. 1986); *see also O'Sullivan v. Boerckel*, 526 U.S. 838,

7  845 (1990); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("To 'fairly present' [a]

8  federal claim to the state courts, [a petitioner] had to alert the state courts to the fact that he was

9  asserting a claim under the United States Constitution." (citing *Duncan*, 513 U.S. at 365-66)). A

10 "mere similarity between a claim of state and federal error is insufficient to establish

11 exhaustion." *Duncan*, 513 U.S. at 366.

12 A claim is considered exhausted via the second avenue "'if it is clear that [the habeas

13 petitioner's] claims are now procedurally barred under [state] law.'" *Gray v. Netherland*, 518

14 U.S. 152, 162-63 (1996) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)); *see also*

15 *Valerio v. Dir. of the Dep't of Prisons*, 306 F.3d 742, 770 (9th Cir. 2002) ("[T]he claim is

16 exhausted because it is procedurally barred."). A claim is also "exhausted because a return to

17 state court for exhaustion would be futile." *Phillips v. Woodford*, 267 F.3d 966, 974 (9th Cir.

18 2001) (citation and internal quotation marks omitted).

19                              b.  Analysis of Exhaustion

20 In the instant case, Petitioner exhausted the first, second, third, fourth, fifth, and twelfth

21 claims of prejudicial error because the California Supreme Court reviewed them in a habeas

22 petition. *Johnson*, 88 F.3d at 829. Since these claims were never discussed in a reasoned state

23 court opinion, "an independent review of the record" will be conducted to determine whether the

24 California Supreme Court's decision to deny these claims was contrary to, or involved an

25 unreasonable application of, clearly established federal law. *Pham*, 400 F.3d at 742.

26 Petitioner, however, did not raise the remaining claims of prejudicial error in any state

court.  These remaining claims are either:  (1) unexhausted because no state court reviewed them, *Johnson*, 88 F.3d at 829; or (2) exhausted because they are procedurally barred.  *Phillips*, 267 F.3d at 974 ("The district court correctly concluded that [the] claims were nonetheless exhausted because 'a return to state court for exhaustion would be futile.'") (citation omitted); *see infra* Part V.C.3.f-k, m (finding alleged errors meritless).

Even if Petitioner's claims are unexhausted, an application for a writ of habeas corpus may be denied on the merits, notwithstanding the applicant's failure to exhaust available state remedies.  28 U.S.C. § 2254(b)(2).  A federal court considering a habeas petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable." *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).  The merits of Petitioner's remaining claims of prejudicial error will be addressed, and this matter is now ready for decision.

2.  Legal Standard for Ineffective Assistance of Counsel Claims

The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court sets forth the test for demonstrating ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  An allegation of ineffective assistance of counsel requires that a petitioner establish two elements:  (1) counsel's performance was deficient; and (2) the petitioner was prejudiced by the deficiency.  *Id.* at 687; *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994).

First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688.  To this end, a petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  *Id.* at 690.  The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  *Id.*  "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990)

21

1   (citing *Strickland*, 466 U.S. at 689).

2        Second, a petitioner must establish that he was prejudiced by counsel's deficient

3   performance.  *Strickland,* 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

4   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

5   been different."  *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine

6   confidence in the outcome."  *Id.*; *see also Williams,* 529 U.S. at 391-92; *Laboa v. Calderon,* 224

7   F.3d 972, 981 (9th Cir. 2000).

8        A court need not determine whether counsel's performance was deficient before

9   examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

10   *Strickland*, 466 U.S. at 697.  Since the petitioner must affirmatively prove prejudice, any

11   deficiency that does not result in prejudice must necessarily fail.  However, certain instances are

12   legally presumed to result in prejudice, e.g., where there was an actual or constructive denial of

13   the counsel's assistance, or where the State interfered with counsel's assistance.  *Id.* at 692; *see*

14   *United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984).

15                  3.   Analysis of Ineffective Assistance of Counsel Claims

16                     a.   Failure to Subpoena Lieutenant Phil Serna

17        In ground two, Petitioner argues defense counsel should have called Lieutenant Phil

18   Serna "to testify on planted evidence."  Pet'r's Pet. 16.  Specifically, Petitioner asserts Lieutenant

19   Serna reported that "he personally stood over the area searching for several minutes in the day

20   light and the casing was not there[.]"  *Id.*  Petitioner also claims Lieutenant Serna "went on to

21   report, that, the casing did not appear to be withered [sic][;] it was still shiny inspite [sic] of the

22   inclement weather the night before."  *Id.*

23        Petitioner's claim is based on Lieutenant Serna's report about the continuing

24   investigation at the trailer home, the day after the shooting.  Pet'r's Pet. Ex. F, at 28-30.  In the

25   report, Lieutenant Serna stated:

26             Officer Hegenbart and I were preparing to leave when Mr. Ryan

1      called out to us.  He ran out to our vehicle and told us he had found
       a shell casing. . . . In the gravel we could clearly see a shiny brass
2      colored, small caliber shell casing. . . . Officer Hegenbart and I
       were somewhat concerned about this finding as we had thoroughly
3      inspected the area where the casing was located.  I had personally
       stood over the area for several minutes searching for the casing.
4      The casing itself was not imbedded in the gravel but was lying on
       top.  There had been a large amount of foot traffic the night before
5      and the area had been searched with the use of flashlights.
       Additionally, the casing did not appear to have been weathered.  It
6      was still shiny in spite of the inclement weather the night before.

7  *Id.* at 29-30.

8          At trial, Officer Paul Hegenbart testified that he and Lieutenant Serna "probably spent 45

9  minutes at least searching the whole area, the porch, the bottom of the steps, the inside of the

10 residence," on the night of the shooting, and confirmed he "did not locate anything of what

11 would be considered evidentiary value at that point."  Lodged Doc. No. 20, Rep.'s Tr. 149-50.

12 Officer Hegenbart testified they later discovered the .22-caliber shell casing in the same area after

13 Don Ryan "call[ed] it to [their] attention."  *Id.* at 152.  Officer Hegenbart confirmed "one

14 possibility" could be that the shell casing was there, but he "didn't see it."  *Id.*  He also

15 acknowledged the casing may have been "placed there after he looked . . . ."  *Id.*  Officer

16 Hegenbart testified he sought to determine whether Ryan had "planted the casing" by searching

17 Ryan's trailer for "any type of evidentiary value as far as firearms,"[15] but did not find anything.

18 *Id.* at 159-60.

19         Roxanne Peralta, a witness, also testified against Petitioner.  Before the shooting, Peralta

20 testified she saw Petitioner with a .22 caliber semi-automatic handgun.  *Id.* at 31-32.  The gun

21 was never recovered.  *See id.* at 16.

22         Before rendering its verdict, the trial court commented, "[A]s to the suggestion that

23 perhaps the evidence was planted in this case, I don't find any credible evidence to support that

24 _____

25         [15] This included ".22 pistol bullet casings," .22 pistols, "empty boxes that related to .22
    ammunition," and "any clips related to [a] .22 caliber pistol."  Lodged Doc. No. 20, Rep.'s Tr.
26 159-60.

1    allegation under any scenario presented.  It's clear Mr. DeMel was shot.  So, there just doesn't

2    seem to be any rhyme or reason why evidence would be planted under that scenario." *Id.* at 271.

3          The failure to call a witness cannot establish ineffective assistance when defense counsel

4    is well-informed of the facts and circumstances of the witness's account.  *Eggleston v. U.S.*, 798

5    F.2d 374, 376 (9th Cir. 1986).  Defense counsel "had complete access to all of the witness

6    interviews and statements taken by the government" and was clearly aware of the testimony that

7    Lieutenant Serna might offer at trial.  *Id.*  Trial counsel's tactical decisions deserve deference

8    when counsel makes an informed decision based on strategic trial considerations and the decision

9    appears reasonable under the circumstances.  *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir.

10   1994).  A trial attorney's strategic decisions are not ineffective assistance simply because in

11   retrospect better tactics are known to have been available.  *See Strickland*, 466 U.S. at 689; *see*

12   *also United States v. Mayo*, 646 F.2d 369, 375 (9th Cir.) ("[Petitioner's] allegations amount to

13   nothing more than a difference of opinion with respect to trial tactics.  That alone generally does

14   not constitute a denial of effective assistance of counsel."), *cert. denied*, 454 U.S. 1127 (1981).

15   The ultimate decision not to call witnesses at trial is well within counsel's "full authority to

16   manage the conduct of the trial."  *Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("Putting to one

17   side the exceptional cases in which counsel is ineffective, the client must accept the

18   consequences of the lawyer's decision . . . to decide not to put certain witnesses on the

19   stand . . . .").

20         Petitioner failed to show it was objectively unreasonable for counsel not to call

21   Lieutenant Serna as a witness.  Petitioner did not point to any potential testimony that Lieutenant

22   Serna could have offered that would not have been cumulative to testimony already presented at

23   trial, or that would have been favorable to the defense.  *Snow v. Simmons*, 474 F.3d 693, 729

24   (10th Cir. 2007) ("Generally, counsel's failure to call witnesses whose testimony would be

25   corroborative or cumulative of evidence already presented at trial is not deemed constitutionally

26   deficient."); *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988) (finding counsel was not

1  deficient for failing to call two witnesses whose "testimony . . . would have been merely

2  cumulative"); *see also United States v. Olson*, 846 F.2d 1103, 1110 (7th Cir.) ("[S]ince the

3  [witness] testimony would have been cumulative if presented and, in our opinion, damaging to

4  the defendant's case, we conclude that the decision to refrain from calling him as a witness was

5  proper and in no way prejudiced the defense."), *cert. denied*, 488 U.S. 850 (1988).  Further,

6  Petitioner failed to satisfy his burden of showing that, but for counsel's failure to call Lieutenant

7  Serna, there is a reasonable probability that Petitioner would not have been convicted.

8  Petitioner's claim that counsel was deficient for failing to subpoena Lieutenant Serta fails.

9                    b.   Failure to Subpoena and Investigate Deborah Farris

10             In ground two, Petitioner argues trial counsel should have subpoenaed and investigated

11  Deborah Farris because "Deborah Farris informed Lt. Phil Serna that Petitioner had a [s]haved

12  [b]ald [h]ead with new tattoo on date of incident."  Pet'r's Pet. 16 (internal quotation marks

13  omitted).  According to Petitioner, this contradicts the victim's testimony that Petitioner "had

14  short hair on day of incident."  *Id.*

15             Petitioner misinterprets the record.  Lieutenant Serna's report reveals the following:

16                    We had received information from other witnesses that [Petitioner]
                      had several tattoos including a new one on the back of his shaved
17                    head.  The witnesses didn't know what the tattoo said.  I spoke
                      with Farris about tattoos and asked her about tattoos that
18                    [Petitioner] had.  She indicated that he had numerous tattoos.
                      When I asked her about any new ones she identified one on the
19                    back of his head.  She told me that [Petitioner] had a large tattoo on
                      the back of his head with the word "Thug . . . ."  She didn't know
20                    what the second word of the tattoo said.

21  Pet'r's Pet. Ex. F, at 29.

22             At trial, DeMel, the victim, testified to the following:

23                    [DEFENSE COUNSEL:]  Okay.  And you recalled the individual
                      as having short hair; is that correct?
24
                      [DEMEL:]  Yes.
25
                      [DEFENSE COUNSEL:]  And how short as far as hair?
26

                                        25

1          [DEMEL:]  Stubbies.

2          [DEFENSE COUNSEL:]  And okay.  So you could see hair but it
           was very short in nature?

3

4          [DEMEL:]  Yes.

5    Lodged Doc. No. 20, Rep.'s Tr. 107-08.

6          The record fails to show that, if Farris was called as a witness, her testimony would have

7    undermined the identification of Petitioner as the gunman.  Nor does the record reveal Farris

8    would have offered Petitioner an alibi.  Farris was not a percipient witness and had no relevant

9    testimony to offer regarding the shooting.  Petitioner failed to show defense counsel's failure to

10   investigate or subpoena Farris was unreasonable, or that it was prejudicial.  Petitioner is not

11   entitled to habeas relief on this claim.

12                          c.  Failure to Subpoena or Investigate Don Ryan

13         In ground two, Petitioner contends trial counsel was deficient for failing to investigate or

14   subpoena Don Ryan because Ryan would have impeached Peralta's testimony that she was

15   present when Petitioner shot DeMel.  Pet'r's Pet. 17.  Specifically, Petitioner seeks to challenge

16   Peralta's testimony that "she was standing next to victim [DeMel] when he got shot."  *Id.*

17   Rather, Petitioner argues that Detective Jason Imboden's police report shows "Roxanne Peralta

18   and Lisa Nix were inside [the] residence seated on [the] love seat and couch," and Peralta "has

19   unresolved charges ([f]elony) pending against her at the time of trial."[16]  *Id.*

20         Part of Detective Imboden's police report summarized his interview with Ryan.  Pet'r's

21   Pet. Ex. G, at 36-39.  Ryan told Detective Imboden that he returned to his trailer, where

22   Petitioner and his roommate, Peralta, were inside.  *Id.* at 36.  Petitioner and Peralta were dating

23   "for several months," and Peralta had been staying at Ryan's residence since September 2003.

24   *Id.*  Ryan then explained DeMel was on his way to pick Ryan up and take him to a friend's house

25

26         [16] Petitioner's remark about Peralta's pending felony charges is addressed in Parts V.C.3.i
     and V.E.3.

                                              26

1  for New Year's Eve.  *Id.*  DeMel "came to the [trailer] and walked inside."  *Id.*  Petitioner then

2  "started a verbal altercation" with DeMel, and Petitioner "walked outside followed by [DeMel]."

3  *Id.*  Later in the interview, Detective Imboden asked Ryan "who else was inside his residence

4  during the incident."  Detective Imboden reported:

> 5  Ryan related (IP) Peralta and a female named "Lisa" were inside.
> He explained that (IP) Peralta was seated in the loveseat and "Lisa"
> 6  was seated on the couch in the living room.  Shortly after the shot
> was fired, he heard (IP) Peralta state, "Oh my God, let's go, let's
> 7  get out of here."  (W) Ryan related the females left on their own
> accord and were not kidnapped or forced to leave with [Petitioner].

8

9  *Id.* at 37.  Based on this report, Petitioner argues Peralta was inside the trailer, rather than "on the

10 porch," Lodged Doc. No. 20, Rep.'s Tr. 29, at the time of the shooting.

11      However, the report appears to show Ryan was explaining who was present in the trailer

12 before Petitioner and DeMel stepped outside.  This is consistent with Detective Imboden's

13 testimony at the preliminary hearing:

> 14  [DEPUTY DISTRICT ATTORNEY:]  Did Mr. Ryan indicate to
> you that anything significant happened then?
> 15
> 16  [IMBODEN:]  As he was eating his sandwich, Roxanne Peralta,
> which was a girlfriend of [Petitioner], stood up and yelled . . . .[17]
> 17  [DEPUTY DISTRICT ATTORNEY:]  And what did Mr. Ryan do
> if anything?
> 18
> 19  [IMBODEN:]  He asked, "What?"  Roxanne repeated that
> statement.  Then he walked outside to the porch area where he saw
> Ortiz and [DeMel].
> 20  . . . .
> 21  [DEPUTY DISTRICT ATTORNEY:]  You indicated that Mr.
> Ryan went outside?
> 22
> 23  [IMBODEN:]  Yes, he did.
> 24  [DEPUTY DISTRICT ATTORNEY:]  And did Mr. Ryan tell you

25      [17] The trial court sustained defense counsel's motion to strike Peralta's statement for lack
of foundation, so Peralta's statement is not included here.  Lodged Doc. No. 18, Clerk's Tr. 38;
26 Prelim. Hr'g Tr. 15, June 18, 2004.

1   what happened at that point?

2   [IMBODEN:]  Yes, he was standing next to Mr. [DeMel], which
    was on the porch.

3

4   [DEPUTY DISTRICT ATTORNEY:]  And did he indicate to you
    where [Petitioner] was located?

5   [IMBODEN:]  He was positioned towards the lower step of the
    steps leading up to the porch.

6

7   [DEPUTY DISTRICT ATTORNEY:]  Did Mr. Ryan indicate to
    you what happened next?

8   [IMBODEN:]  Yes, he heard a shot or a pop which -- he believed
    he heard two pops.  Mr. [DeMel] placed his hand on his chest.

9

10  Lodged Doc. No. 18, Clerk's Tr. 37-39; Prelim. Hr'g Tr. 14-16, June 18, 2004.  This shows that

11  while Ryan and Peralta were inside the trailer when DeMel and Petitioner went outside, Peralta

12  then followed DeMel outside.  Peralta saw the two men facing off and called out to Ryan, who

13  also came outside and witnessed the shooting.

14      This is also consistent with Peralta and DeMel's testimony at trial.  Peralta testified that

15  she followed DeMel outside the trailer, after DeMel followed Petitioner outside the trailer.

16  Lodged Doc. No. 20, Rep.'s Tr. 56.  Peralta was "on the porch" when she confirmed she "heard a

17  single shot."  *Id.* at 58.  Likewise, DeMel testified Ryan was standing "behind [him] on the side

18  of [him]" when he was shot.  *Id.* at 87.

19      Based on this evidence, trial counsel could have decided not to call Ryan as a witness

20  because Ryan could provide additional testimony identifying Petitioner as the shooter.  *See*

21  *Denham v. Deeds*, 954 F.2d 1501, 1505 (9th Cir. 1992) (holding trial counsel did not err in not

22  calling witness who "would have done 'more harm than good'").  Further, Petitioner does not

23  provide an affidavit from Ryan as to how he would have testified on this matter.  Nothing

24  indicates that Ryan would have testified Peralta was in the trailer when DeMel was shot.  Since

25  Ryan's testimony most likely would have hurt Petitioner's case, trial counsel did not render

26  ineffective assistance in not calling Ryan as a witness.

d.  Failure to Call Eric Vierra as a Witness

In ground two, Petitioner asserts counsel rendered ineffective assistance for failing to call his nephew, Eric Vierra, as a defense witness.  Petitioner argues trial counsel should have used Vierra to challenge DeMel's identification of Petitioner as the shooter.  Pet'r's Pet. 17-18. Petitioner submits an affidavit from Vierra dated June 8, 2007, which states, among other things:

> [Petitioner] had [a] completely clean shaven bald head with a big tattoo . . . .
>
> [Petitioner] had a red 49ers jersey on with the number 5.
>
> . . . .
>
> [Petitioner] is my blood uncle and during the evening of 12-31-03[,] [Petitioner] met me at the k-mart shopping center in Paradise, CA[,] and gave me a birthday gift of forty dollars ($40.00).
>
> . . . I informed [Petitioner] to attend my [b]irthday party in Chico[,] C[A] later in the evening[,] [and] [Petitioner] arrived wearing the same thing as earlier.

Pet'r's Pet. Ex. B, at 8.  Petitioner argues this would have challenged DeMel's testimony because DeMel testified gunman was wearing a "blue possibly yellow" jacket, and DeMel "[d]id not see tattoos . . . nor facial hair."  Pet'r's Pet. 18 (emphasis omitted); *see* Lodged Doc. No. 20, Rep.'s Tr. 107-08.  "However, petitioner's alibi witness[,] Eric D. Vierra[,] describes facial hair, red clothing and tattoos."  Pet'r's Pet. 18.

The record shows trial counsel was able to use other evidence that more effectively cast doubt on eyewitness identification of Petitioner.  On cross examination, DeMel testified he told the police that the gunman was a "white man" with "strong facial features," Lodged Doc. No. 20, Rep.'s Tr. 107-08, when Petitioner is Hispanic.  Pet'r's Pet. 16.  Detective Imboden testified on cross examination that DeMel told him the gunman wore "black-colored clothing."  Lodged Doc. No. 20, Rep.'s Tr. 170.  As for the tattoo on the back of Petitioner's head, DeMel clarified, "I don't remember seeing the back of [Petitioner's] head."  *Id.* at 109.  Additionally, Vierra only hinted that he "kn[e]w and clearly remember[ed] [Petitioner's] physical appearance," including,

29

*inter alia*, "facial hair."  Pet'r's Pet. Ex. B, at 8.  Vierra's declaration, however, failed to specify any details as to Petitioner's facial hair.  *Id.*  Counsel could have reasonably concluded that Vierra's testimony would be merely corroborative that Petitioner was wrongly identified as the gunman, and counsel's tactical decision not to call an easily impeachable family witness was reasonable and did not constitute ineffective assistance of counsel.  *See Wade v. Calderon*, 29 F.3d 1312, 1318-19 (9th Cir. 1994) (holding failure to offer corroborating evidence not ineffectiveness), *overruled on other grounds by Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003).

Although Petitioner also deems Vierra as his "alibi witness," Pet'r's Pet. 18, Vierra's declaration is vague as to the times Vierra asserted he saw Petitioner.  Vierra's declaration fails to establish that Petitioner was not at the trailer at the time DeMel was shot.  *See McCauley-Bey v. Delo*, 97 F.3d 1104, 1106 (8th Cir. 1996) (finding no prejudice from counsel's failure to call witnesses because impact of uncalled witness would have been negligible due to their close relationship to defendant), *cert. denied*, 520 U.S. 1178 (1998); *Bergman v. Tansy*, 65 F.3d 1372, 1380 (7th Cir. 1995) (holding counsel was not ineffective for failing to call family members who would easily have been impeached for bias), *cert. denied*, 517 U.S. 1160 (1996); *Romero v. Tansy*, 46 F.3d 1024, 1030 (10th Cir.) (noting testimony by defendant's family members is of "significantly less exculpatory value than the testimony of an objective witness"), *cert. denied*, 515 U.S. 1148 (1995); *United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1089 (N.D. Ill. 1999) (stating trial counsel reasonably could have thought petitioner's mother and girlfriend would not be credible alibi witnesses given their "obvious personal interest in his acquittal").  Counsel's decision not to call Vierra as a defense witness was not ineffective assistance.

e.  Failure to Subpoena and Investigate Medical Personnel

In ground two, Petitioner broadly contends trial counsel failed to subpoena and investigate "[m]edical [p]ersonnel."  Pet'r's Pet. 18 (internal quotation marks omitted).

1   However, Petitioner fails to name any of the medical personnel witnesses that counsel allegedly

2   should have called.  *United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir. 1985) (holding

3   ineffective assistance of counsel claim fails when petitioner fails to identify witnesses that should

4   have been called for defense).  Petitioner also neglects to specify what information these

5   witnesses could have provided, or how counsel's failure to call them was prejudicial.  *See Dows*

6   *v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (determining ineffective assistance of counsel claim

7   fails when there is no evidence in record that witnesses actually exist or evidence that they would

8   provide helpful testimony).  Petitioner's claim that counsel rendered ineffective assistance by

9   failing to call medical personnel as witnesses does not warrant habeas relief.

10                    f.  Failure to Investigate "Tyson"

11          In ground two, Petitioner alleges counsel was deficient for "fail[ing] to investigate who

12   this unknown 'Tyson' person [was], who was there among other people."  Pet'r's Pet. 20.  At

13   trial, Bill Dunn testified he drove DeMel and "a guy named Tyson" to Ryan's trailer.  Lodged

14   Doc. No. 20, Rep.'s Tr. 114.  Dunn stated he did not know Tyson's last name.  *Id.* at 120.  Dunn

15   testified as follows:

16          [DEPUTY DISTRICT ATTORNEY:]  Did you see [Petitioner] do
            anything after the gunshot was fired?
17
            [DUNN:]  I wasn't there, sir.
18
            [DEPUTY DISTRICT ATTORNEY:]  You're gone?
19
            [DUNN:]  I'm gone.  Tyson was in the truck with me.  He took off
20          running as soon as he got over there.  He was at the intersection, I
            picked him up on the way back out of there.
21
            . . . .
22
            [DEPUTY DISTRICT ATTORNEY:]  Haven't seen [Tyson] in the last year and a
23          half?

24          [DUNN:]  (Shaking head).

25          [DEPUTY DISTRICT ATTORNEY:]  I'm sorry, have you?

26          [DUNN:]  No, sir.  Sorry.

                                        31

*Id.* at 119-20.  Petitioner fails to provide an affidavit from Tyson or otherwise show how he

might have offered favorable testimony at trial.  *See Olson*, 846 F.2d at 1111 (holding counsel

was not ineffective for failing to "properly investigate, interview, and call as witnesses two

individuals," where petitioner "failed to allege specifically what evidence such investigation and

interviews would have uncovered"); *see also James v. Borg*, 24 F.3d 20, 26 (9th Cir.)

("Conclusory allegations which are not supported by a statement of specific facts do not warrant

habeas relief."), *cert. denied*, 513 U.S. 935 (1994).  Petitioner's claim on ineffective assistance

for failure to investigate "Tyson" fails.

g.  Failure to Challenge Officer Paul Hegenbart's Testimony

In ground two, Petitioner argues trial counsel was deficient for "fail[ing] to challenge" the

"perjured testimony of Officer Hegenbart."  Pet'r's Pet. 15.  Specifically, Petitioner asserts

Officer Hegenbart "testified that[] the shell casing was slightly wet," but he "did not report on [a]

shell casing found in a[n] unsecure [sic] crime scene[.]"  *Id.*  Petitioner added Lieutenant Serna

did "report on [a] shell casing," and "no where [sic] . . . did he state that the casing was slightly

wet."  *Id.* (emphasis omitted).

The record in fact shows trial counsel challenged Officer Hegenbart's testimony.  On

cross examination, trial counsel drew out from Officer Hegenbart that a "maximum of four"

police officers went over to the trailer on the night of the shooting, and "each officer would have

a flashlight."  Lodged Doc. No. 20, Rep.'s Tr. 146.  Officer Hegenbart confirmed that "between

the time [he] had gone over there and the time that [he left]," he did not "locate at the bottom or

the base of the stairs" at the trailer "anything [he] considered of evidentiary value."  *Id.* at 148.

Officer Hegenbart then testified that after he left and before he arrived the following morning,

"[i]t was raining throughout the night."  *Id.*

On cross examination, trial counsel elicited from Officer Hegenbart that he and

Lieutenant Serna searched "the area at the base of the steps" for "45 minutes at least" the

following morning.  *Id.* at 149.  Still, they located nothing of "evidentiary value."  *Id.* at 150.

1  Trial counsel then asked Officer Hegenbart about his initial observations of the casing, after

2  Ryan pointed it out to him:

3          [DEFENSE COUNSEL:]  And when it -- when you observed it, is
           it fair to say it did not look weathered?
4
           [HEGENBART:]  Yes.
5
           [DEFENSE COUNSEL:]  Didn't have any -- did not appear that it
6          had been stepped on; is that correct?

7          [HEGENBART:]  That's correct.

8          [DEFENSE COUNSEL:]  Did not appear to have any wet residue
           on it; is that correct?
9
           [HEGENBART:]  It might have had a small amount of wetness on
10         it, yes.

11         [DEFENSE COUNSEL:]  It did not appear to have anything in
           terms of dirt or grime on it; is that correct?
12
           [HEGENBART:]  That's correct.
13

14  *Id.* at 150-51.  Officer Hegenbart confirmed that he found the casing "lying on top of the gravel .

15  . . at the base of the steps."  *Id.* at 151.

16         The trial court understood how defense counsel was challenging Officer Hegenbart's

17  testimony and asked a few clarifying questions, including whether the casing was placed there

18  after Officer Hegenbart had looked the second time.  *Id.* at 152.  Officer Hegenbart

19  acknowledged, "That's a possibility also."  *Id.*

20         Defense counsel then reemphasized that the "crime scene" may have been "unsecure

21  [sic]" on re-cross examination, Pet'r's Pet. 15:

22         [DEFENSE COUNSEL:]  Officer Hegenbart, is it fair to state that
           area where the casing was located had been thoroughly inspected
23         before you had it pointed out to you?

24         [HEGENBART:]  To the best of our abilities, yes.

25  Lodged Doc. No. 20, Rep.'s Tr. 153.  Since trial counsel in fact challenged Officer Hegenbart's

26  testimony, Petitioner fails to establish either substandard performance or prejudice for this claim.

33

h.  Counsel's Contradiction During Trial

In ground two, Petitioner argues counsel was deficient because "trial counsel had agreed with prosecution that[] I.D. was not an issue." Pet'r's Pet. 16 (emphasis and internal quotation marks omitted).  Petitioner alleges counsel contradicted himself by "argu[ing] and present[ing] an I.D. issue with [O]fficer J. Imboden." *Id.*

Petitioner takes trial counsel's comment, i.e., "an ID issue is completely out of the equation," out of context.  Lodged Doc. No. 20, Rep.'s Tr. 180.  Rather, trial counsel stated that identity was not a reason for the State to admit into evidence, under Section 1101(b) of the California Evidence Code, Petitioner's prior shootings toward Dunn and Ryan.  *Id.* at 176. Peralta testified she was present when Petitioner shot a firearm two other times, prior to the New Year's Eve shooting.  *Id.* at 65-72.  One shooting occurred "about a week" before the New Year's Eve shooting, "around Christmas," at Ryan's trailer.  *Id.* at 66, 68.  Peralta was in the bathroom when she heard the gunshot.  *Id.* at 66.  She came out, saw Petitioner with the gun, and did not see anyone who was shot.  *Id.* at 66-67.  Peralta recalled that both Ryan and Dunn were present, and neither were holding guns.  *Id.*  The trial court recounted, "Mr. Dunn said[,] '[Petitioner] shot me between the legs.'" *Id.* at 182.  The other shooting occurred during the summer, "probably around August," before the New Year's Eve shooting.  *Id.* at 71.  Peralta testified she saw Petitioner "point[] [the firearm] at the floor" toward Ryan, and the bullet "hit Ryan in his right calf or shin."  *Id.* at 70.  This shooting occurred inside Ryan's trailer, during the day.  *Id.* at 71.

The trial court acknowledged that "[t]he main prohibition under 1101(a) is that prior access not be permissible to show propensity."  *Id.* at 176.  As the trial court mentioned, "[h]ere the People are arguing from their trial brief that the prior shootings are not to be admitted to show propensity just because they are relevant as to an issue in dispute[,] and the two issues that they mention in their trial brief are identity and intent."  *Id.*  The trial court first presented its "initial thinking" and then "hear[d] from both counsel."  *Id.*

34

1    The trial court initially focused on why identity should not be a reason to admit into

2  evidence the prior shootings:

3               It seems to me that what we have here is a case where if you
               believe the People's witnesses, identity is not an issue at all.
4               Clearly the witnesses know the defendant, especially the first
               witness, Ms. Peralta.  She apparently was involved with him in a
5               romantic relationship and spent at least a few days with him after
               the shooting.  So I don't think this is the sort of case where
6               typically 1101(b) evidence is admitted for identity . . . . You have a
               modus operandi and you're trying to show a signature.

7

8  *Id.* at 176-77.

9    Next, trial court turned to intent as a reason to admit into evidence the prior shootings:

10              In terms of intent though, I think if in fact it's going to come in,
               that's where I think it arguably might come in.  And then the
11              question would be assuming the facts are favorable to the People in
               the best light, how would those prior shootings be relevant to the
12              issue of intent.  [Petitioner] is charged with attempted murder. . . .
               [O]f course, that charge requires intent to kill.

13

14  *Id.* at 177.  The trial court then allowed the State to be heard first.

15    During its argument regarding admittance of the prior shootings, the State actually

16  recognized trial counsel's defense strategy of identity:

17              I would tend to agree with the Court, it's far more stronger on
               intent than an identity.  At the time the brief was written the only
18              information the People had as to the defense in the case was that an
               identity would be an issue.  That's part of why it was put in
19              there.

20  *Id.* at 179.

21    When defense counsel presented his argument, he made a reasonable, tactical decision to

22  concentrate on the intent reasoning to exclude the prior shootings:

23              . . . I don't believe that there's anything as far as an ID issue that is
               presented to the Court.  I think that it has been correctly analyzed
24              and I think an ID issue is completely out of the equation as far as
               analysis.

25
               That means it then comes to a matter as far as intent. . . . [T]he
26              Ewoldt case . . . probably at least in part addresses some of these

1
2

> issues.  And it has to be sufficiently similar to support the inference that [Petitioner] probably harbored the same intent in each instance.

3
4

> And I would submit that similarity is not present to -- between all of these in order to support the harboring of the same intent.

5
6
7
8

> However, in the event the Court does get involved as far as analysis of intent, I would submit that perhaps it cuts the other way.  That as far as the intent that was displayed in each of those cases was certainly not an intent to kill and that none of the victims, evidently, in those cases felt it was such[.] . . . [I]f the Court is . . . going to permit it, then I think that you should leave the door open as far as to what really it shows with respect to intent.

9    *Id.* at 180-81.

10           Ultimately, the trial court excluded the evidence, agreeing with defense counsel's

11   argument that intent was dissimilar between the prior shootings versus the instant case.  *Id.* at

12   182.  When rendering its decision, the trial court acknowledged, "It's not like there's some

13   problem making the ID.  The problem might be reasons to falsely ID."  *Id.* at 183.  The trial court

14   concurred with defense counsel's reasoning that "Ewoldt stands for the proposition the other acts

15   [be] . . . sufficiently similar to support an inference that a person possessed the same intent in all

16   the instant cases."  *Id.*  The trial court found here, "we're kind of trying to show that in the prior

17   incidents he had a different intent, to wit, not to kill, and the People's argument in this case[,]

18   when he shot the guy in the chest, the intent was to kill."  *Id.*  The trial court explained,

19   "Obviously when you point a gun away from someone or down towards the ground and shoot it,

20   there is a different intent than when you point a gun at chest level and shoot it."  *Id.* at 184.  The

21   trial court added that "even under a 352 analysis, I think admitting those would tend to perhaps

22   prejudice [Petitioner]."  *Id.*

23           In sum, the record shows defense counsel reasonably chose to concentrate on the intent

24   reasoning to exclude the prior shootings from evidence.  *Sanders*, 21 F.3d at 1456.  The trial

25   court agreed with defense counsel and found that intent was dissimilar between the prior

26   shootings and the present case, and excluded the prior shootings from evidence.  Contrary to

36

1  Petitioner's assertions, defense counsel did not contradict himself, and habeas relief is not

2  warranted on this claim.

3                    i.  Failure to Challenge Roxanne Peralta's Testimony

4         In ground two, Petitioner claims trial counsel was ineffective because he "fail[ed] to

5  challenge . . . Roxanne Leah Peralta[']s testimony."  Pet'r's Pet. 15, 17.  Petitioner points out that

6  Peralta testified "the shooting took place when petitioner walked outside," "exited from the

7  residence," and "petitioner pulled a gun from the holster strapped on him."  *Id.* at 17.

8         The record belies Petitioner's claim that trial counsel did not challenge Peralta's

9  testimony.  On cross examination, trial counsel first brought up Peralta had charges pending

10 against her.  Lodged Doc. No. 20, Rep.'s Tr. at 45.  When asked if it were "fair to say that [she]

11 w[as] waiting to see what came out of this case," *id.*, the trial court sustained the State's

12 objection based on attorney-client privilege.  *Id.*  Trial counsel elicited that Peralta and Petitioner

13 had "a romantic relationship," *id.* at 50, when the State had brought up earlier only that Petitioner

14 was Peralta's "close personal friend," *id.* at 24, and that Petitioner had a wife.  *Id.* at 42.  Peralta

15 also admitted that on the night of the shooting, she was on "oxy 40," *id.* at 51; DeMel "was under

16 the influence of something," *id.* at 52; and Ryan had used methamphetamine and "had been up

17 for a couple of nights."  *Id.* at 54.  Trial counsel then questioned Peralta about her, DeMel, and

18 Petitioner's positions when the shooting occurred:

19              [DEFENSE COUNSEL:]  All right.  And Sean DeMel is at the top
               of the stairs; is that correct?
20
               [PERALTA:]  No.  I'm at the top of the stairs.
21
               [DEFENSE COUNSEL:]  All right, and Sean is some distance then
22             from you; is that correct?

23             [PERALTA:]  About 30 feet.

24             [DEFENSE COUNSEL:]  30 feet?

25             [PERALTA:]  Three.

26             [DEFENSE COUNSEL:]  I'm sorry, three feet away?

                                      37

1     [PERALTA:]  Yes.

2     . . . .

3     [DEFENSE COUNSEL:]  You heard a single shot; is that correct?

4     [PERALTA:]  Yes.

5     [DEFENSE COUNSEL:]  Just a single shot; is that correct?

6     [PERALTA:]  Yes.

7     [DEFENSE COUNSEL:]  At that point then Sean DeMel walks
      into -- immediately after that Sean DeMel walks into the trailer, is
8     that correct?

9     [PERALTA:]  I don't know what Sean did.

10    *Id.* at 58-60.

11          Defense counsel questioned Peralta in an attempt to prove Peralta failed to see everything

12    that happened, or was fabricating events and confused, which is a reasonable strategy.  *Sanders*,

13    21 F.3d at 1456.  To the extent Petitioner argues trial counsel should have pursued a theory that

14    Peralta was "inside [the] residence seated on the love seat and couch" when the shooting

15    occurred, Pet'r's Pet. 17, defense counsel had no obligation to pursue claims or defenses that

16    have "almost no chance of success."  *See Knowles v. Mirzayance*, ___ U.S. ___, ___-___,129 S.

17    Ct. 1411, 1419-22 (2009); *see also United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981)

18    ("[A] difference of opinion with respect to trial tactics . . . alone generally does not constitute a

19    denial of effective assistance of counsel."); *cf. supra* Part V.C.3.c (showing Peralta's testimony is

20    consistent with other witness accounts).  Petitioner's claim that defense counsel was deficient for

21    failing to challenge Peralta's testimony fails.

22                     j.  Failure to Challenge Detective Jason Imboden's Testimony

23          In ground two, Petitioner asserts trial counsel was ineffective for "fail[ing] to challenge"

24    Detective Imboden's testimony regarding:  (1) DeMel's description of Petitioner's clothing; (2)

25    DeMel's description of the firearm; (3) DeMel's identification of Petitioner; and (4) the correct

26    date of when a photographic lineup was presented to DeMel.  Pet'r's Pet. 18-19.

                                                    38

1      Contrary to Petitioner's assertions, trial counsel challenged Detective Imboden's

2  testimony on cross examination, and Petitioner even cites Detective Imboden's testimony elicited

3  by trial counsel on cross examination.  First, Detective Imboden's testimony on cross

4  examination appears to contradict DeMel's earlier testimony on Petitioner's clothing.  Earlier at

5  trial, DeMel testified on cross examination that Petitioner wore a "colorful" jacket that was

6  "[b]lue, possibly yellow."  Lodged. Doc. No. 20, Rep.'s Tr. 107.  In contrast, Detective Imboden

7  testified on cross examination that, in a tape recorded interview, DeMel indicated "Ortiz wore

8  black-colored clothing that included baggy pants."  *Id.* at 170.  To Detective Imboden's

9  knowledge, DeMel did not "describe[] the clothing of [Petitioner] as being colorful."  *Id.* at 171.

10  Trial counsel effectively used Detective Imboden's testimony of Petitioner's clothing to

11  contradict DeMel's testimony of Petitioner's clothing.

12      Second, the record shows trial counsel challenged Detective Imboden's testimony

13  regarding DeMel's description of the firearm:

14          [DEFENSE COUNSEL:] Officer Imboden, your first interview
            with Sean DeMel was on December 31st of 2003; is that correct?
15
            [IMBODEN:]  Yes.
16
            . . . .
17
            [DEFENSE COUNSEL:] Now, also did he indicate any or give
18          you any description as far as the weapon?

19          [IMBODEN:] I'd have to refer to my report for that specific.

20          [DEFENSE COUNSEL:] All right.  Let me ask you this.  Did he
            know what kind of weapon it was?
21
            [IMBODEN:] I believe he stated it was a handgun.
22
            [DEFENSE COUNSEL:] All right.  If you look at your report,
23          trying to streamline this as best as possible, for December 31st,
            page 3, line 56 -- actually 55 and 56.
24
            [IMBODEN:] It stated he did not know at the time.
25

26  *Id.* at 204-05.  The record reveals trial counsel attempted to impeach Detective Imboden's

testimony with his report.  Although Detective Imboden testified that DeMel stated the weapon

was a "handgun," the report shows that DeMel "did not know" what the weapon was.  *Id.* at 205.

Third, the record shows trial counsel tried to cast doubt on Detective Imboden's

testimony regarding DeMel's identification of Petitioner.  Trial counsel challenged the reliability

of DeMel's identification by attempting to imply DeMel identified Petitioner only after hearing

media coverage on the shooting:

> [DEFENSE COUNSEL:] . . . [D]id you ask Mr. DeMel whether he had seen any photos through the media at the time of your interview with him on January 2nd?
>
> [IMBODEN:]  I don't think so.
>
> [DEFENSE COUNSEL:]  All right.  Do you recall asking him whether or not he had seen anything either on TV or in the newspaper as far as a photograph of the individual?
>
> [IMBODEN:]  I'd have to refer back to my report.
>
> [DEFENSE COUNSEL:]  Okay.  Why don't you take a minute and do that.
>
> [IMBODEN:]  Do you have a page number?
>
> [DEFENSE COUNSEL:] . . . I do have a page, the date is January 3rd in the lower-hand portion of the report.  Page 5, the sup [sic] date is January 2nd, line --
>
> [IMBODEN:]  Yes, I found it.
>
> [DEFENSE COUNSEL:]  Line 99 and 100.  So Mr. [DeMel] did relate to you that a person -- that he had information about what had been shown on TV; is that correct?
>
> [IMBODEN:]  He said that a friend had talked with him, yes.
>
> [DEFENSE COUNSEL:]  All right.  And (pause) do you know [what] the date was -- that the photo line-up was shown to Mr. DeMel?
>
> [IMBODEN:]  I'd have to research and for the exact date.  I do know it was after the 2nd of January.
>
> [DEFENSE COUNSEL:]  Do you know how much after the 2nd?
>
> [IMBODEN:]  Once again, can I refer to Sergeant McLaughlin's

1   supplemental report?

2   [DEFENSE COUNSEL:]  Certainly.

3   [IMBODEN:]  Okay.  I found it.

4   [DEFENSE COUNSEL:]  And what is that date?

5   [IMBODEN:]  It says here on the report it's January 4th.

6   *Id.* at 218-19.  Ultimately, Detective Imboden acknowledged he did not know whether DeMel

7   "had observed any media photos of [Petitioner]" prior to the photographic lineup identification.

8   *Id.* at 220.

9       Additionally, trial counsel challenged DeMel's identification of Petitioner using

10  Detective Imboden's testimony on cross examination.  Earlier at trial, DeMel admitted on cross

11  examination he described the gunman to the police as "a white man."  *Id.* at 107.  However, on

12  cross examination, Detective Imboden recognized that Petitioner's race, as listed on Petitioner's

13  rap sheet, was "Hispanic."  *Id.* at 222-23.  The record reveals trial counsel effectively cross

14  examined Detective Imboden.

15      Fourth, counsel's failure to impeach Detective Imboden on an inconsistency between his

16  preliminary hearing testimony and his trial testimony is inconsequential.  At the preliminary

17  hearing, Detective Imboden testified DeMel was presented with the photographic lineup on

18  January 7, 2004.  Lodged Doc. No. 18, Clerk's Tr. 36; Prelim. Hr'g Tr. 13.  However, at trial,

19  Detective Imboden testified the photographic lineup was shown to DeMel on January 4, 2004.

20  Lodged Doc. No. 20, Rep.'s Tr. 219.

21      The different dates mentioned are insignificant.  Had counsel raised this point, it would

22  not have damaged Detective Imboden's credibility, nor would it have affected the trial's

23  outcome.  *Cf. Knowles*, 129 S. Ct. at 1422 ("The law does not require counsel to raise every

24  available nonfrivolous defense.").  The record shows Detective Imboden incorrectly recited the

25  photographic lineup date at the preliminary conference, then offered the correct date at trial after

26  referring to the police report.  Lodged Doc. No. 20, Rep.'s Tr. 219.  Petitioner's claim that

1  counsel was deficient for failing to challenge Detective Imboden's testimony fails.

2  k.  Failure to Challenge Bill Dunn's Testimony

3  In ground two, Petitioner argues counsel was deficient for "fail[ing] to challenge" Bill

4  Dunn's testimony.  Pet'r's Pet. 15, 19.  Petitioner points out that on direct examination, Dunn

5  affirmed he did not know who was shot.  Lodged Doc. No. 20, Rep.'s Tr. 117.  Dunn also was

6  unable to "say for sure that [he] saw [Petitioner] holding that gun."  *Id.* at 119.

7  Since parts of Dunn's testimony identifying Petitioner as the gunman were already shaky

8  on direct examination, trial counsel effectively emphasized these points on cross examination.

9  On cross examination, trial counsel elicited that prior to driving over to Ryan's trailer, Dunn was

10  at a New Year's Eve party where alcohol was present.  *Id.* at 127-28.  When Dunn drove over to

11  Ryan's trailer, it was already "dark;" it was "raining;" and Dunn "ha[d] [his] windshield wipers

12  going."  *Id.* at 127.  Dunn did not "drive into the driveway" at Ryan's trailer; he "didn't even

13  park."  *Id.* at 129.  According to Dunn, he "drove in and shots were fired and [he] left."  *Id.*

14  Dunn admitted he did not report this incident to the police, *id.* at 130; he was not certain what the

15  date was or the month that this happened, *id.* at 131; and he, himself, was not struck with any

16  bullets.  *Id.*  Since trial counsel effectively cross examined Dunn, this claim should be denied.

17  l.  Advising Petitioner to Waive His Right to Jury Trial

18  In ground four, Petitioner argues trial counsel was ineffective for advising him to waive

19  his right to a jury trial, and proceed by a bench trial instead.  Pet'r's Pet. 24.  Petitioner alleges

20  trial counsel informed him that "if [Petitioner was] found guilty" by bench trial, "the sentence

21  would not exceed the last offer of 14 yrs."  *Id.*  According to Petitioner, based on this

22  information, he decided to waive a jury trial.  *Id.*

23  To support his claim, Petitioner submitted four documents:  (1) a declaration from his

24  mother, Guadalupe Quzada Jordan, dated May 7, 2007, Pet'r's Pet. Ex. D-1, at 17-19; (2) a

25  declaration from himself, dated February 1, 2006, Pet'r's Pet. Ex. D-2, at 20-22; (3) a second

26  declaration from himself, dated December 31, 2005, Pet'r's Pet. Ex. D-3, at 23; and (4) a third

declaration from himself, dated December 31, 2005, to which Petitioner attached a page of handwritten notes. Pet'r's Pet. Ex. E, at 25-26. First, in her declaration, Petitioner's mother claimed she was present when trial counsel informed Petitioner that "if he forewent [a] jury trial and instead opted for trial by [j]udge he would receive no worse than 14 years in prison." Pet'r's Pet. Ex. D-1, at 17. But, according to Petitioner's mother, trial counsel stated if Petitioner "went with a jury trial and was found guilty he would most likely receive a life sentence." *Id.* Based on this advice, Petitioner's mother stated she suggested Petitioner "should forego the jury trial," and "it pains [her] to know that [she] advised [her] own son to do something he otherwise wouldn't have done had it not been for the assurance of trial attorney." *Id.*

Second, in Petitioner's declaration dated February 1, 2006, Petitioner reiterated trial counsel informed him that if he waived his right to a jury trial "and had a trial by judge[,] . . . at worst case scenerio [sic] [he] would not receieve [sic] no more than a 14 yr. max sentence." Pet'r's Pet. Ex. D-2, at 20. According to Petitioner, trial counsel stated that if a jury convicted him, he "would face a life sentence in prison." *Id.* Petitioner asserted trial counsel advised him "to go infront [sic] of the judge, to be safe" because "14 yrs. is a long time[,]" but Petitioner "will still parole and not go infront [sic] of B.P.T. as inmates with life sentences must." *Id.* Petitioner claimed he waived his right to a jury trial "due to [trial counsel's] information." *Id.*

Third, in Petitioner's declaration dated December 31, 2005 (without handwritten note), Petitioner contended trial counsel informed him "the benifits [sic] . . . would be a maximum sentence of fourteen yrs., no life[.]" Pet'r's Pet. Ex. D-3, at 23.

Fourth, in Petitioner's declaration dated December 31, 2005 (with handwritten note), Petitioner alleged trial counsel provided Petitioner with three options on November 7, 2005, at Butte County Jail, due to the "inaccuarate [sic] information [Petitioner] was giv[en] to waive [his] jury trial []rights[]." Pet'r's Pet. Ex. E, at 25. According to Petitioner, trial counsel wrote these options on a yellow piece of paper, which Petitioner attached to the declaration:

#1. First option, set court trial aside and have new trial with Mr.

43

1    Ortner.

2    #2.  Second option, have new trial[] with Russell Miller.  Jury,
     Court.
3
     #3.  Third option, plead to a 15yr+
4

5    *Id.*

6                    i.    Legal Standard for Advising Petitioner to Waive Right to Jury

7                          Trial

8           Petitioner contends this claim is governed by *Hill v. Lockhart*, 474 U.S. 52 (1985).  *Hill*

9    involved an ineffective assistance of counsel claim where trial counsel advised the defendant to

10   plead guilty.  474 U.S. at 53-55.  In *Hill*, the Supreme Court held that to show prejudice under

11   *Strickland* for a guilty plea, there must exist a reasonable probability that, but for counsel's

12   errors, the defendant "would not have pleaded but would have insisted on going to trial."  *Id.* at

13   59 (1985); *Langford*, 110 F.3d at 1386.

14          However, the Supreme Court never held that the same test for prejudice applies to

15   ineffective assistance of counsel claims based on advising a defendant to waive the right to a jury

16   trial.  Instead, the standard *Strickland* test for prejudice applies, i.e., whether it is reasonably

17   probable that the defendant would have received a more favorable outcome by jury trial than by

18   bench trial.  *Hensley v. Crist*, 67 F.3d 181, 185 (9th Cir. 1995) (finding counsel's advice to waive

19   jury trial and submit case to judge on stipulated facts did not prejudice petitioner, where evidence

20   was so strong that "more likely than not [the petitioner] would have been convicted had he gone

21   to trial"); *Correll v. Thompson*, 63 F.3d 1279, 1292 (4th Cir. 1995), *cert. denied*, *Correll v. Jabe*,

22   516 U.S. 1035 (1996); *Hatch v. Oklahoma*, 58 F.3d 1447, 1459 (10th Cir. 1995), *cert. denied*,

23   517 U.S. 1235 (1996); *Green v. Lynaugh*, 868 F.2d 176, 177-78 (5th Cir.), *cert. denied*, 493 U.S.

24   831 (1989).

25                   ii.    Analysis of Advising Petitioner to Waive Right to Jury Trial

26          Petitioner's claim fails because:  (1) his declarations are not credible; (2) trial counsel's

                                              44

1   decision to advise Petitioner to proceed by bench trial was strategically reasonable; and (3)

2   Petitioner cannot demonstrate there was a reasonable likelihood that he would have obtained a

3   more favorable result with a jury trial.  First, Petitioner and his mother's declarations lack

4   credibility and are not persuasive on the issue since they would be inclined to distort trial

5   counsel's words so Petitioner may obtain habeas relief.  *See* cases cited *supra* p. 30.  Notably,

6   Petitioner failed to provide a declaration from trial counsel to verify or corroborate these

7   statements.

8          The record also fails to support the declarations.  The record shows Petitioner's waiver of

9   his right to a jury trial on May 18, 2005, was knowing, voluntary and intelligent, and the trial

10  court found it as such:

11          [DEFENSE COUNSEL:] Your Honor, based on the dialogue or
            discussion engaged in by the Court and counsel, I have spoken
12          with [Petitioner] again, gone over the pros and cons for jury trial,
            discussed with him the pros and cons of waiving a jury and doing
13          this as a court trial.

14          Based on these discussions with [Petitioner] which has taken place
            over the past, almost one hour, and in that past hour have pretty
15          much focused my discussions with [Petitioner], in addition to
            involving my investigator in discussions as well, it is [Petitioner's]
16          desire to waive a jury trial and proceed with a court trial in front of
            Your Honor.

17
            [THE COURT:]  All right [Petitioner], is that correct, sir?
18
            [PETITIONER:]  Yes, sir.
19
            [THE COURT:]  All right and I just need to ask you some
20          questions.  You understand you do have a right to a jury trial?

21          [PETITIONER:]  Yes.

22          [THE COURT:]  And what that involves is we have a panel that is
            out there right now.  From that panel we would select jurors and at
23          least twelve, . . . and in order for you to be convicted of any of the
            charges or any of the allegations to have been found true, all twelve
24          jurors would have to be convinced of the truth of the charges and
            the standard of proof that they would have to be convinced is
25          beyond a reasonable doubt for you to be found guilty [] for any of
            the allegations . . . .  Do you understand that?

26

1    [PETITIONER:]  Yes I do.

2    [THE COURT:]  Now if you waive your right to jury trial, the matter is going to be decided by one person, to wit, me.  So instead of having twelve people that have to be unanimous it would just be myself.  Do you understand that?

3

4    [PETITIONER:]  Yes.

5    [THE COURT:]  I still would have to be convinced beyond a reasonable doubt of the truth of the charges as well as special allegations, you understand that?

6

7    [PETITIONER:]  Yes I do sir.

8    [THE COURT:]  Now, you understand I just want the record to reflect there's been no promises made to you, correct?

9

10   [PETITIONER:]  Correct.

11   [THE COURT:]  Obviously, I can't indicate how I'm going to rule on anything till I hear all of the evidence, you understand that?

12

13   [PETITIONER:]  Yes I do.

14   [THE COURT:]  Having that in mind, do you have any questions you want to ask me before I actually take your official jury waiver?

15   [PETITIONER:]  No, sir[,] I believe you answered by being beyond a reasonable doubt and hearing evidence and all that I think [sic].

16

17   . . . .

18   [THE COURT:]  Right, the standard of proof is exactly the same as a jury trial, it has to be proven beyond a reasonable doubt.

19

20   [PETITIONER:]  Yes, sir.

21   [THE COURT:]  Do you have any other questions?

22   [PETITIONER:]  No, sir.

23   [THE COURT:]  All right.  Then do you hereby give up your right to a jury trial?

24   [PETITIONER:]  Yes I do.

25   . . . .

26   [THE COURT:]  All right.  [Deputy District Attorney], are you

46

satisfied or are there any specific questions you think the Court should ask [Petitioner]?

[DEPUTY DISTRICT ATTORNEY:]  Based on one prior case[,] [I] just ask that the Court inquire that [Petitioner] understands there are no promises, express or implied, benefit offered in anyway [sic] to him for this choice.

[THE COURT:]  Did you understand that question?

[PETITIONER:]  That basically there's been nothing promised [to] me?

[THE COURT:]  Yes.

[PETITIONER:]  Yes.

[THE COURT:]  Does that satisfy you?

[DEPUTY DISTRICT ATTORNEY:]  It does, Your Honor.

[THE COURT:]  All right.  Then as to [Petitioner] I will find that [Petitioner] has knowingly and intelligently waived his right to jury trial.  [Defense counsel][,] do you join in that waiver?

[DEFENSE COUNSEL:]  I do.

Lodged Doc. No. 20, Rep.'s Tr. 1-6.  As the record reflects, the trial court asked Petitioner twice whether he was made any promises for waiving his right to a jury trial.  *Id.* at 3, 5-6.  Both times, Petitioner stated he was not made any promises.  *Id.*

Further, according to Petitioner, trial counsel admitted providing inaccurate information on November 7, 2005, prior to the ruling on Petitioner's motion for a new trial and sentencing. Pet'r's Pet. Ex. E, at 25.  However, when denying Petitioner's motion for a new trial on January 25, 2006, the trial court made no reference to the three options Petitioner alleged were offered. Nothing in the trial record supports Petitioner's claim that his trial counsel met with the trial court or prosecutor after realizing Petitioner faced a sentence of thirty-five years to life to discuss options for a new trial.  Even if trial counsel wrote the notes submitted by Petitioner, those notes do not establish one of those three options would take place because trial counsel misinformed Petitioner.  Those notes only list three options; trial counsel may have outlined possible options if

47

1   the trial court agreed to grant a new trial motion on other grounds.

2         Second, trial counsel's decision to waive his client's right to a jury trial was a sound

3   tactical decision.  *See Strickland*, 466 U.S. at 689 (Courts must "indulge a strong presumption

4   that counsel's conduct falls within the wide range of reasonable professional assistance; that is,

5   the [petitioner] must overcome the presumption that, under the circumstances, the challenged

6   action might be considered sound trial strategy." (internal quotation marks and citation omitted));

7   *Hovey v. Ayers*, 458 F.3d 892, 906 (9th Cir. 2006) ("*Strickland* requires deference to informed

8   strategic choices . . . ."); *cf. Guam v. Santos*, 741 F.2d 1167, 1169 (9th Cir. 1984) (per curiam)

9   ("A tactical decision by counsel with which the defendant disagrees cannot form the basis of a

10   claim of ineffective assistance of counsel.").  The State had filed a motion to admit evidence of

11   two prior shootings by Petitioner toward Ryan and Dunn.  Lodged Doc. No. 20, Rep.'s Tr. 175-

12   76.  Trial counsel may have reasonably decided that, if evidence were admitted, a judge would

13   have been better able than a jury to consider this evidence for a limited purpose, rather than to

14   show propensity.[18]  Trial counsel's advice for Petitioner to waive his right to a jury trial was

15   reasonable.

16         Third, Petitioner does not state how a jury trial would have changed the verdict.  Pet'r's

17   Pet. 24-26.  Nothing in the record indicates the judge conducted the trial in an unfair manner.

18   The evidence against Petitioner was overwhelming:  the victim and another witness, Petitioner's

19   girlfriend, identified Petitioner.  Lodged Doc. No. 20, Rep.'s Tr. 33 (Petitioner's girlfriend); *id.* at

20   84-89 (victim).  The trial record does not show any evidence pointing to a third party culprit, nor

21   any evidence that anyone had a motive to implicate Petitioner falsely.  Given the weight of the

22   evidence against Petitioner, there was not a reasonable likelihood that Petitioner would have

23   obtained a more favorable result with a jury trial.  *Hensley*, 67 F.3d at 185 (finding counsel's

24

----

25      [18] Although the trial court ultimately excluded the evidence, trial counsel's
26   reasonableness is evaluated without "the distorting effects of hindsight," but rather "from
  counsel's perspective at the time."  *Strickland*, 466 U.S. at 689.

1   advice to waive jury trial and submit case to judge on stipulated facts did not prejudice petitioner,

2   where evidence was so strong that "more likely than not" petitioner "would have been convicted

3   had he gone to trial"); *Correll*, 63 F.3d at 1292 ("[T]he evidence against [the petitioner] was

4   overwhelming, and we have no doubt that had the case been presented to a jury the same result

5   would have obtained."). Petitioner's claim that trial counsel misadvised him to waive his right to

6   a jury trial fails.

7             m.  Failure to Object to Trial Court and Deputy District Attorney's

8                  Analysis of Great Bodily Injury

9           In ground five, Petitioner argues "trial counsel failed to object to the judge and deputy

10  dist. attorney[']s self medical analysis of what [great bodily injury] is."  Pet'r's Pet. 28.

11  Petitioner asserts "it was improper and unethical for a judge and a Dep. Dist. attorney who are

12  both non-medical physician experts to determine what [great bodily injury] is and is not."  *Id.* at

13  30.  To the extent Petitioner's claim is interpreted as an ineffective assistance of counsel claim

14  for failure to object, this claim also fails.

15          No California case requires a judge, when acting as a fact finder, to be a medical expert to

16  make a finding of great bodily injury.  Likewise, no California case requires an attorney to be a

17  medical expert to argue for a finding of great bodily injury.  Petitioner fails to cite to any

18  California cases requiring expert medical testimony to support a finding of great bodily injury.

19  Further, sufficient evidence supports a finding of great bodily injury.  *See infra* Part V.E.4.

20  Petitioner's trial counsel was not ineffective for failing to raise a meritless objection.  *See Juan*

21  *H. v. Allen*, 408 F.3d 1262, 1273-74 (9th Cir. 2005) (affirming state court's holding that

22  counsel's performance did not fall below objective standard of reasonableness on account of not

23  raising meritless objection), *cert. denied*, 546 U.S. 1137 (2006); *Rupe v. Wood*, 93 F.3d 1434,

24  1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance . . .

25  ."), *cert. denied*, 519 U.S. 1142 (1997); *Baumann v. United States*, 692 F.2d 565, 572 (9th Cir.

26  1982) ("The failure to raise a meritless legal argument does not constitute ineffective assistance

1    of counsel.").  In total, Petitioner's ineffective assistance of counsel claims fail.

2        D.  Ground Three:  Actual Innocence

3        In ground three, Petitioner contends he is "actually innocent of commiting [sic] the

4    crime[;] hence a procedural default cannot be used to deny the right to have [the] habeas claim

5    heard on the merits."  Pet'r's Pet. 22.  The California Supreme Court denied this claim without

6    comment or citation on habeas review, *see In re Ortiz*, 2008 Cal. LEXIS 3973, at *1, which is

7    construed as a decision on the merits.  *Hunter*, 982 F.2d at 348.  Since no state court issued a

8    reasoned opinion explaining its denial of this claim on the merits, "an independent review of the

9    record" will be conducted to determine whether the California Supreme Court's denial was

10   objectively unreasonable.  *Pham*, 400 F.3d at 742.

11                1.  Legal Standard for Actual Innocence Claim

12       The United States Supreme Court has expressly left open the question of whether a

13   freestanding claim of actual innocence is cognizable on federal habeas review.  *Dist. Attorney's*

14   *Office for the Third Judicial Dist. v. Osborne*, ___ U.S. ___, ___, 129 S. Ct. 2308, 2321 (2009)

15   ("Whether such a federal right," i.e., the "right to be released upon proof of 'actual innocence[,]'

16   . . . exists is an open question.");  *Herrera v. Collins*, 506 U.S. 390, 400, 417 (1993) ("Claims of

17   actual innocence based on newly discovered evidence have never been held to state a ground for

18   federal habeas relief absent an independent constitutional violation occurring in the underlying

19   state criminal proceeding[;]" but, "in a capital case[,] a truly persuasive demonstration of 'actual

20   innocence' made after trial would render the execution of a defendant unconstitutional, and

21   warrant federal habeas relief if there were no state avenue open to process such a claim[,]" and

22   "the threshold showing for such an assumed right would necessarily be extraordinarily high.");

23   *see also House v. Bell*, 547 U.S. 518, 554-55 (2006) (expressly declining to resolve whether

24   federal courts may entertain freestanding claims of actual innocence, stating only that petitioner

25   fell short of "extraordinarily high" threshold suggested by *Herrera*).

26       The Ninth Circuit has assumed that freestanding actual innocence claims are cognizable

                                                    50

in both capital and non-capital cases, and has articulated a minimum standard of proof applicable to such claims. *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc), *cert. denied*, 523 U.S. 1133 (1998). "[A] habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Id.* (citing *Herrera*, 506 U.S. at 442-44 (Blackmun, J., dissenting)). The petitioner's burden in such a case is "extraordinarily high" and requires a showing that is "truly persuasive." *Id.* (quoting *Herrera*, 506 U.S. at 417); *see also Spivey v. Rocha*, 194 F.3d 971, 979 (9th Cir. 1999) (denying habeas relief where "the totality of the new evidence [did] not undermine the structure of the prosecution's case"), *cert. denied*, 531 U.S. 995 (2000); *Swan v. Peterson*, 6 F.3d 1373, 1384-85 (9th Cir. 1993) (denying habeas relief where newly discovered evidence did not contradict materially the evidence presented at trial, did not demonstrate that State's evidence was false, and was merely equivocal), *cert. denied*, 513 U.S. 985 (1994).

Aside from providing a basis for relief in the limited circumstances described above, actual innocence may also serve as a gateway through which a habeas petitioner can overcome a procedural default which would otherwise bar consideration of the merits of other claims. *See Schlup v. Delo*, 513 U.S. 298, 316 (1995) ("[I]f a petitioner . . . presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims."). "[A] petitioner can overcome procedural default and obtain federal review of the merits of his claim . . . if he presents sufficient evidence to 'demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007) (en banc) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)), *cert. denied*, ___ U.S. ___, 129 S. Ct. 37 (2008). "[T]he miscarriage of justice exception is limited to those *extraordinary* cases where the petitioner asserts his innocence and establishes that the court cannot have confidence in the contrary finding of guilt." *Johnson v. Knowles*, 541 F.3d 933, 937 (9th Cir.

51

2008), *cert. denied*, ___ U.S. ___, 129 S. Ct. 2060 (2009).  In order to pass through the "actual

innocence" gateway, a petitioner "must show that, in light of all the evidence, . . . 'it is more

likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable

doubt.'"  *Majoy v. Roe*, 296 F.3d 770, 775-76 (9th Cir. 2002) (quoting *Schlup*, 513 U.S. at 327).

The *Schlup* standard is demanding and permits review only in extraordinary cases.  *House v. Bell*,

547 U.S. 518, 538 (2006).  It is an "exacting standard" and requires factual innocence, not mere

legal insufficiency.  *Bousley v. United States*, 523 U.S. 614, 623 (1998); *Majoy*, 296 F.3d at 776.

2. Analysis of Actual Innocence Claim

Petitioner bases this claim on allegedly "newly discovered evidence," Pet'r's Pet. 2,

where Petitioner provides a declaration from Charles Houk.  According to Houk's declaration, he

was an inmate "at the Deuel Vocational Institution in Tracy, California," and his "CDC number

is V-25414." Pet'r's Pet. Ex. C-1, at 12.  Houk declared:

> 3. [Petitioner] is not the person who shot Sean DeMel.  I am the person who shot him.
>
> 4. On or about December 31, 2004, at about 6:00 p.m., my friend, Don Ryan, called me and complained about a Mexican man who was giving him problems and refused to leave his trailer.  He told me that this person was a drug dealer and carried drugs and cash on him.
>
> 5. I decided to help Ryan and at the same time, if the opportunity presented itself, to steal from the Mexican.
>
> 5. [sic] I then drove from my home in Oroville to Paradise and parked in a parking lot near Ryan's trailer.  I walked to his front yard and stood in the shadows to see what was going on.  I was dressed in black so I could not be seen.
>
> 6. At this time, I was using drugs heavily and was feeling paranoid.
>
> 7. I saw a stocky bald Mexican man stuffing things into the trunk of a car.  At that moment, a truck pulled into the driveway and several guys jumped out.  They approached and surrounded the man I had seen.  A fight broke out.
>
> 8. I ran into the crowd and fired in the direction of the Mexican fellow.

52

1    9.  As I ran away, I saw the others run and then saw the truck pull
     away quickly.
2
     10.  Later that evening, at perhaps 9:00 or 9:30, I received a call
3    from Don Ryan who told me that Brother Sean got shot.  I told him
     that if my name came up, I would kill everybody involved before
4    the cops could catch me, starting with him and Sean.

5    11.  I have come to despise the man I used to be.  Not a day goes
     by that I do not feel remorse for all the bad things I've done.
6
     12.  I want to take responsibility for my actions.  I do not want
7    someone else to be punished for something I did.

8    *Id.*

9         First, to the extent Petitioner asserts a freestanding actual innocence claim, he is not

10   entitled to relief because, as noted above, the United States Supreme Court has expressly left

11   open the question of whether a freestanding actual innocence claim based on newly discovered

12   evidence constitutes grounds for habeas relief in a non-capital case.  In the absence of Supreme

13   Court authority establishing the cognizability of a freestanding actual innocence claim on federal

14   habeas review, the California Supreme Court's rejection of petitioner's freestanding actual

15   innocence claim could not be contrary to, or involve an unreasonable application of, "clearly

16   established" Supreme Court authority.  *See Carey v. Musladin* ("*Musladin*"), 549 U.S. 70, 77

17   (2006) ("Given the lack of holdings from this Court regarding the [issue in dispute] it cannot be

18   said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" (quoting 28

19   U.S.C. § 2254(d)(1))); *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir.) ("If no Supreme Court

20   precedent creates clearly established federal law relating to the legal issue the habeas petitioner

21   raised in state court, the state court's decision cannot be contrary to or an unreasonable

22   application of clearly established federal law." (citation omitted)), *cert. denied*, 543 U.S. 1037

23   (2004).

24        Second, even assuming Petitioner's claim is cognizable on federal habeas review,

25   Petitioner is not entitled to relief because the evidence he presents does not affirmatively prove

26   he is probably innocent.  The events described in Houk's declaration differ from the events

                                          53

1   described by witnesses at trial, and from the information Ryan provided to the police.  Petitioner

2   fails to provide a corroborating declaration from Ryan, or any of the witnesses who testified at

3   trial.  Houk's name also does not appear in any of the police reports Petitioner submitted in

4   support of the instant petition, and Houk's declaration fails to state the nature of his conviction or

5   the length of his sentence.  Houk's claim of responsibility is questionable given the various

6   reasons why one inmate might attempt to accept the blame for another one.

7        At trial, Peralta testified she saw Petitioner remove a .22 caliber semi-automatic gun

8   "[f]rom a holster that was strapped onto" himself.  Lodged Doc. No. 20, Rep.'s Tr. 31-32.

9   Peralta testified that "[Petitioner] had a gun pointed at [DeMel]," while Petitioner was "[a]t the

10  bottom of the stairs."  *Id.* at 32-33.  Peralta saw "the gun in [Petitioner's] hands when it was

11  shot," and DeMel "got shot."  *Id.* at 33.  After the shooting occurred, Peralta testified she, Lisa

12  Nix, and Petitioner drove to "Sterns Road," where Petitioner "got out of the car."  *Id.* at 36.

13  Petitioner then "stashed" the gun "in the woods."  *Id.*  Peralta also added that Petitioner asked her

14  to "take the rap" for "[h]im shooting Sean."  *Id.* at 39.  Peralta explained, "[Petitioner] told me

15  this is his third strike, that he'll get 25-to-life and I will only get six months being as it's my first

16  offense."  *Id.* at 40.  Peralta never mentioned a group of men surrounding Petitioner or DeMel

17  outside the trailer, or seeing anyone run toward DeMel before he was shot.

18        DeMel testified he arrived at Ryan's trailer at about 9:00 p.m. on December 31, 2003,

19  after a friend named "Billy" drove him there.  *Id.* at 77, 80.  According to DeMel, he walked into

20  the trailer and was inside for "maybe five minutes."  *Id.* at 82.  DeMel first spoke with Ryan, *id.*,

21  then asked Petitioner "what was up."  *Id.* at 83.  DeMel testified Petitioner's response was "get

22  off him," which DeMel understood to mean, "[l]eave him alone."  *Id.*  DeMel also affirmed he

23  had not done anything to Petitioner.  *Id.*  DeMel stated he "walked outside with [Petitioner]" and

24  introduced himself "not in a mean way," saying "'I want to let you know who I am.  I'm Brother

25  Sean.'"  *Id.* at 84.  Petitioner replied, "'I'm Oso.'"  *Id.*  Then, DeMel testified Petitioner shot him.

26  *Id.* at 85.  DeMel never testified about Petitioner being surrounded before the shot was fired, or

1  seeing anyone run toward Petitioner.

2        Dunn testified he drove DeMel to Ryan's trailer on December 31, 2004.  *Id.* at 113-14.

3  Dunn saw Petitioner at the "trunk of the car," *id.* at 116, and then Petitioner "walk[ed] towards

4  the front porch."  *Id.* at 117.  Dunn answered that after Petitioner walked toward the steps, it

5  "[s]eemed instantly" that Dunn saw the shot.  *Id.* at 118.  After seeing the shot, Dunn "threw [his

6  truck] in reverse and started burning rubber backwards."  *Id.*  Dunn never testified about a group

7  of men surrounding Petitioner before DeMel was shot.

8        Even assuming an actual innocence claim is cognizable on federal habeas review,

9  Petitioner's "new evidence" falls well short of meeting the extraordinarily high threshold of

10  demonstrating Petitioner was probably innocent.  *See*, *e.g.*, *Herrera*, 506 U.S. at 417-18 (noting

11  affidavits, "given over eight years after petitioner's trial[,] . . . must be considered in light of the

12  proof of petitioner's guilt at trial"); *Carriger*, 132 F.3d at 477 ("[T]he [third party] confession by

13  itself falls short of affirmatively proving that [the petitioner] more likely than not is innocent.");

14  *Cress v. Palmer*, 484 F.3d 844, 855 (6th Cir. 2007) (holding petitioner failed to satisfy

15  "hypothetical *Herrera* standard" with new evidence, including "a confession from someone who

16  was strongly motivated to confess falsely for ulterior reasons").  The California Supreme Court

17  reasonably denied Petitioner's actual innocence claim, and Petitioner is not entitled to habeas

18  relief on this claim.

19        E.  Ground Five:  Insufficient Evidence

20        In ground five, Petitioner argues "the evidence of [great bodily injury] was insufficient

21  and the evidence of attempted murder was insufficient."  Pet'r's Pet. 27.  For the attempted

22  murder, Petitioner asserts "no intent to kill can rationally be inferred from the[] alleged facts."

23  *Id.* at 19.  For the great bodily injury, Petitioner argues the victim "suffered only two small

24  puncture wounds from a single gunshot with minimal blood loss."  *Id.* at 28 (citation and

25  emphasis omitted).

26  ///

1    1.  State Court Decision

2            Petitioner's insufficient evidence claim was first raised on direct appeal to the California

3    Court of Appeal, *see* Lodged Doc. 2, at 13-19.  The Court of Appeal issued a reasoned opinion

4    rejecting the claim.  *See* Lodged Doc. 5.  Petitioner then appealed to the California Supreme

5    Court, *see* Lodged Doc. No. 8, which summarily denied the claim.  *See* Lodged Doc. No. 9.  The

6    California Supreme Court's unexplained denial is looked through, and the Court of Appeal's

7    reasoned opinion is reviewed to determine whether that decision was contrary to, or an

8    unreasonable application of, clearly established federal law.  *Bailey,* 339 F.3d at 1112-13.

9    2.  Legal Standard for Insufficient Evidence Claim

10           When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is

11   only available if it is found that upon the record evidence presented at trial, viewed in the light

12   more favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond

13   a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Under *Jackson*, the court

14   must review the entire record when the sufficiency of the evidence is challenged on habeas.

15   *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985), *vacated on other grounds*, 789 F.2d

16   722 (9th Cir. 1986) (en banc), *rev'd*, 483 U.S. 1 (1987).  It is the province of the jury to "resolve

17   conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic

18   facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  "The question is not whether we are

19   personally convinced beyond a reasonable doubt.  It is whether rational jurors could reach the

20   conclusion that these jurors reached."  *Roehler v. Borg*, 945 F.2d 303, 306 (9th Cir. 1991).

21   Under *Jackson*, the federal habeas court determines evidence sufficiency "with explicit reference

22   to the substantive elements of the criminal offense as defined by state law."  443 U.S. at 324

23   n.16.  Federal courts must apply an "additional layer of deference" under AEDPA on federal

24   habeas review of an insufficient evidence claim.  *Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th

25   Cir. 2005).  The question is whether the Court of Appeal's rejection of Petitioner's claim was an

26   unreasonable application of *Jackson* to the facts of this case.

56

3.  Analysis of Insufficient Evidence for Attempted Murder

The Court of Appeal rejected Petitioner's insufficient evidence for attempted murder claim as follows, in relevant part:

> ""The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]"" [Citations.]"  ([*People v.*] *Smith* [(2005)] 37 Cal.4th [733,] 738-739.)

> "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.)  "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' [Citation.]" (*Smith, supra,* 37 Cal.4th at p. 739.)  "Express malice requires a showing that the assailant ""either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' [Citation.]"" [Citations.]" (*Ibid.*)  While "evidence of motive is often probative of intent to kill," motive is not required to establish intent to kill. (*Id.* at p. 741.)  "[T]he mental state required to convict a defendant of attempted murder[] may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*Id.* at p. 741.)

> "'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." [Citation.]' [Citations.]" (*Smith, supra,* 37 Cal.4th at p. 741.)  In *Smith,* the California Supreme Court concluded the evidence was sufficient to support a finding that Smith intended to kill a baby and the baby's mother when he "fired a single shot into [a car] from a position directly behind it and a distance of approximately one car length as [the car] was pulling away from the curb," and the bullet passed through the mother's headrest, narrowly missing the mother and the baby.  (37 Cal.4th at pp. 742-743.)

> The facts in this case are even more compelling.  [Petitioner] pointed a gun directly at DeMel and fired a single shot from a distance of several feet to at most 20 feet, hitting DeMel in the chest.  At the time, DeMel was standing, facing [Petitioner].  Given these facts, the trial court reasonably could conclude that [Petitioner] intended to kill DeMel, i.e., purposely shot DeMel in the chest with "'a deliberate intent to unlawfully take away

[DeMel's] life' [citation] or knowledge that his act of shooting [DeMel in the chest] would, ""to a substantial certainty,"" result in [DeMel's] death. [Citation.]"  (*Smith*, *supra*, 37 Cal.4th at p. 743.)

[Petitioner] argues that an inference he intended to kill DeMel "is precluded by [his] failure to fire a second shot when it was obvious that the first had not achieved any deadly purpose, given the absence of any interference or threat compelling [Petitioner] to abandon the effort."  While [Petitioner] fails to specify the fact upon which he bases his argument, it appears to be based on the fact that DeMel remained standing after being shot.  There are two problems with [Petitioner's] argument.

First, DeMel's failure to fall to the ground after being shot did not make it "obvious" that he would survive.  Second, even if it did, it does not follow that [Petitioner] lacked the animus to kill when he shot DeMel.  (*Smith*, *supra*, 37 Cal.4th at p. 741 [""that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance""].)  Contrary to [Petitioner's] assertion, the trial court reasonably could have concluded that [Petitioner's] failure to fire a second shot was due to his desire to make a quick getaway and avoid apprehension, and not because he lacked the intent to kill DeMel.  Sufficient evidence supports the attempted murder conviction.

Lodged Doc. No. 5, at 4-6.

The Court of Appeal's decision was not contrary to, or an unreasonable application of, the *Jackson* standard.  The record reflects that sufficient evidence supports Petitioner's attempted murder conviction.  Right before the shooting, Petitioner and DeMel were "staring one another down."  Lodged Doc. No. 20, Rep.'s Tr. 58.  Petitioner held the gun "in front of him," fired, and hit DeMel in "the middle of [his]" chest, "kind of a little bit to the left of center."  *Id.* at 88-89.  DeMel testified Petitioner was about twenty feet from him when Petitioner fired the shot.  *Id.* at 91.  The Court of Appeal, therefore, reasonably held that this evidence was sufficient to support an attempted murder conviction.  *Cf. People* v. *Smith*, 37 Cal. 4th 733, 736, 742-43, 37 Cal. Rptr. 3d 163, 124 P.3d 730 (2005) ("[W]e conclude the evidence is sufficient to support defendant's conviction of the attempted murder of the baby[,]" where defendant "fired a single shot into [a car] from a position directly behind it and a distance of approximately one car length as [the car]

1   was pulling away from the curb," and the bullet "narrowly miss[ed] the mother and the baby.").

2       Petitioner also asserts Peralta's testimony was "[d]ubious" because she was "high on

3   narcotics" at the time of the shooting,[19] and she had "felony charges pending against her" at trial.

4   Pet'r's Pet. 29.  However, "the credibility of witnesses is a question for the [fact finder],

5   unreviewable on appeal." *United States v. Delgado*, 357 F.3d 1061, 1068 (9th Cir. 2004); *see*

6   *Schlup*, 513 U.S. at 330 ("[U]nder *Jackson*, the assessment of the credibility of witnesses is

7   generally beyond the scope of review."); *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2002)

8   ("A jury's credibility determinations are therefore entitled to near-total deference under

9   *Jackson*."); *United States v. Brady*, 579 F.2d 1121, 1127 (9th Cir. 1979) ("[I]t is the exclusive

10  function of the jury to determine the credibility of the witnesses, resolve evidentiary conflicts and

11  draw reasonable inferences from proven facts.").  The Court of Appeal reasonably denied this

12  claim, and Petitioner is not entitled to habeas relief on this claim.

13       4.  Analysis of Insufficient Evidence for Great Bodily Injury

14       The Court of Appeal rejected Petitioner's insufficient evidence for great bodily injury

15  claim as follows, in relevant part:

16      [Petitioner] contends the evidence does not support the trial court's
        finding that he personally and intentionally discharged a firearm
17      causing great bodily injury when he shot DeMel in the chest.  This
        is so, he argues, because DeMel's "wounds were not shown to be
18      other than superficial; no muscles, organs other than the skin, or
        bones were affected; DeMel suffered no loss of consciousness; he
19      remained standing when shot; he walked into the hospital on his
        own; and was not shown to have suffered intense or lasting pain."
20      We are not persuaded.

21      Great bodily injury is "a significant or substantial physical injury."
        (Pen. Code, §§ 12022.7, subd. (f), 12022.53, subd. (d).)  This
22      "standard contains no specific requirement that the victim suffer
        'permanent,' 'prolonged' or 'protracted' disfigurement,
23      impairment, or loss of bodily function." (*People v. Escobar* (1992)
        3 Cal.4th 740, 750 (hereafter *Escobar*).)  A finding that the victim

24

25      [19] At trial, Peralta admitted that about half an hour before the shooting, she had snorted a
    crushed pill of 40 milligrams of oxycotin.  Lodged Doc. No. 20, Rep.'s Tr. 24-25.  She testified
26  that she felt "[n]umb" from the drugs, but it did not affect her vision or her speech.  *Id.* at 25-26.

1    suffered great bodily injury must be upheld on appeal if it is
     supported by substantial evidence, even if the circumstances might
2    reasonably be reconciled with a contrary finding. (*Id.* at p. 750.)

3    *Escobar* upheld a finding of great bodily injury based upon a rape
     victim's bloody knees, vaginal soreness, abrasions, and painful
4    neck. (*Escobar*, *supra*, 3 Cal.4th at pp. 744, 749-750.) Other cases
     have upheld great bodily injury findings based upon gunshot
5    wounds that required little or no medical attention and did not
     inflict internal injuries or long-term pain. (*People v. Wolcott*
6    (1983) 34 Cal.3d 92, 107-108; *People v. Mendias* (1993) 17
     Cal.App.4th 195, 201, 205-206; *People v. Lopez* (1986) 176
7    Cal.App.3d 460, 465.)

8    [Petitioner] shot DeMel in the chest, causing him pain and
     requiring medical treatment. The bullet left two puncture wounds
9    and a bullet fragment "just beneath the skin surface by about 1
     cm." DeMel was kept in the hospital overnight for observation.
10   This evidence supports a finding of great bodily injury. (*Cf.*
     *Escobar*, *supra*, 3 Cal.4th at pp. 744, 749-750; *People v. Wolcott*,
11   *supra*, 34 Cal.3d at pp. 107-108; *People v. Mendias*, *supra*, 17
     Cal.App.4th at pp. 201, 205-206; *People v. Lopez*, *supra*, 176
12   Cal.App.3d at p. 465.)

13   Lodged Doc. No. 5, at 7-8.

14        The Court of Appeal's decision was not contrary to, or an unreasonable application of,

15   the *Jackson* standard. At trial, the parties stipulated that an "amount of . . . medical records . . .

16   have been selected and submitted" as evidence. Lodged Doc. No. 20, Rep.'s Tr. 164. Those

17   records show that DeMel was admitted into the Enloe Medical Center with "two punctate

18   wounds, one in the approximately midclavicular line just above the cost margin and the other is

19   in the mid axillary line, approximately a couple interspaces cephalad to this area." Lodged Doc.

20   No. 19, Clerk's Tr. 2. "Repeat chest x-ray, AP and lateral with markers placed at the two

21   apparent gun shot wound[s] show that the most lateral axillary wound has what appears to be the

22   bullet fragment just beneath the skin surface by about 1 cm." *Id.* The physician characterized the

23   "gunshot wound to [the] left chest" as "probably superficial." *Id.*

24        Under California law, nothing more is required. *Cf. People v. Wolcott*, 34 Cal. 3d 92, 96,

25   107-08, 192 Cal. Rptr. 748, 665 P.2d 520 (1983) (upholding great bodily injury finding where:

26   (1) "bullet struck [the victim] in the calf, and fragments lodged in his arms and legs;" (2) doctor

1   "left the other fragments in [the victim's] arm to work their way out naturally;" and (3) "[the

2   victim] lost little blood . . . and went to work the next day"); *People v. Mendias*, 17 Cal. App. 4th

3   195, 201, 205-06, 21 Cal. Rptr. 2d 159 (1993) (affirming great bodily injury finding where

4   victim:  (1) was shot in his upper left thigh; (2) "was admitted to the hospital, treated for his

5   gunshot wound, and released the next day;" and (3) "the bullet was not removed" and "is not

6   painful when it moves" inside victim); *People v. Lopez*, 176 Cal. App. 3d 460, 462, 465, 222

7   Cal. Rptr. 83 (1986) (upholding great bodily injury finding where one victim was "shot in the

8   right cheek of the hip," and another victim was "shot in the left leg, the bullet penetrating and

9   exiting the thigh").  The Court of Appeal reasonably denied this claim, and habeas relief is

10   unwarranted.

VI.  CONCLUSION

12       For the foregoing reasons, IT IS HEREBY RECOMMENDED that Petitioner's

13   application for writ of habeas corpus be DENIED.

14       These findings and recommendations are submitted to the United States District Judge

15   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one

16   days after being served with these findings and recommendations, any party may file written

17   objections with the court and serve a copy on all parties.  Such a document should be captioned

18   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

19   shall be served and filed within seven days after service of the objections.  Failure to file

20   objections within the specified time may waive the right to appeal the District Court's order.

21   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57

22   (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of

23   appealability should be issued in the event he elects to file an appeal from the judgment in this

24   ///

25   ///

26   ///

case. *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or
deny certificate of appealability when it enters final order adverse to applicant).

DATED:        November 4, 2010.

_____

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE